James C. SHAFFER and Karin G. Shaffer, Appellants (Defendants)

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5496.

Supreme Court of Wyoming.

Feb. 5, 1982.

Richard H. Honaker, State Public Defender, Cheyenne; Donald H. Hall and David B. Hooper, Asst. State Public Defenders, Riverton, for appellants (defendants).

Steven F. Freudenthal, Atty. Gen.; Gerald A. Stack, Deputy Atty. Gen., Criminal Division; John W. Renneisen and Michael L. Hubbard, Asst. Attys. Gen., Cheyenne, for appellee (plaintiff).

Before ROSE, C. J., and RAPER, THOMAS, ROONEY, and BROWN, JJ.

BROWN, Justice.

The appellants, James and Karin Shaffer, were convicted by a Fremont County jury of arson in violation of § 6–7–101, W.S. 1977,[1] for the willful and malicious burning of their mobilehome. Additionally, each appellant was convicted of two counts of felony murder in violation of § 6–4–101, W.S. 1977,[2] for the deaths of their children, Glenn and Opal Shaffer, who occupied the mobilehome along with their younger brother, Robbie.

Appellants were each sentenced to two consecutive life sentences for felony murder and to a term of two to five years for arson. They appeal from their convictions.

We will affirm.

Appellants assign errors as follows:

### I

The court's denial of appellants' first and second motion to suppress was contrary to law and in violation of appellants' constitutional rights.

### II

Admission into evidence of State's Exhibit No. 7 (a photograph of Robbie Shaffer's burned body) was prejudicial error and abuse of the court's discretion because any probative value was outweighed by its inflammatory effect.

### III

Allowing the State to have a State's expert witness testify during the defense's case in chief was prejudicial error and contrary to law.

### IV

The denial of appellants' motion for change of venue, sequestration of the jury and the court's failure to dismiss jurors for cause created cumulative errors which were prejudicial to appellants.

---

1. "Any person who willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any dwelling house, whether occupied, unoccupied, vacant, or any kitchen, shop, stable or other outhouse that is parcel thereof, or belonging to or adjoining thereto or any standing timber on public or privately owned land, whether the property of himself or of another, shall be guilty of arson in the first degree * * *."

2. "(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, sexual assault, arson, robbery or burglary, or by administering poison or causing the same to be done, kills any human being, or whoever purposely and with premeditated malice kills any peace officer, corrections employee or fireman acting in the line of duty, is guilty of murder in the first degree."

## V

Comment during the trial by the court and comments by the prosecutor in closing argument present grounds for mistrial in this case where the evidence is insufficient to sustain the verdict.

In the early morning of November 9, 1979, a fire occurred in appellants' mobilehome, located seven miles from Riverton, Wyoming, near Arapahoe. Appellants' children were alone inside the mobilehome while Jim Shaffer drove his wife Karin to work at the Fremont County Memorial Hospital in Riverton, Wyoming. Mrs. Shaffer arrived at the hospital a little before 7:00 a. m. Mr. Shaffer proceeded to a service station in Riverton, where he remained for approximately 30 minutes. He then drove back to the mobilehome. When he arrived at the mobilehome, he said smoke was coming from the front door. After a brief attempt to enter, he ran to a neighbor's mobilehome and had the neighbor phone the Riverton Fire Department. Mr. Shaffer then ran back to the mobilehome with the neighbor's son and removed the two older children, Glenn and Opal, who were still alive. Glenn and Opal were transported by ambulance to Fremont County Memorial Hospital, where efforts to save them failed. Shortly before the ambulance departed, Mr. Shaffer reentered the mobilehome to see about Robbie, the youngest child. Robbie was dead. Mr. Shaffer said, "Robbie's cremated in his crib."

After the ambulance taking Opal and Glenn to the hospital left, Mr. Shaffer talked to some people in the area of the mobilehome. He told one woman, "I sure had a mess. I didn't have any insurance or anything on that trailer. I didn't know how I was going to pay for all of this." Mr. Shaffer's counsel asked him at trial why he mentioned the mess and the insurance. Mr. Shaffer replied, "Because it was the truth." At this same time Shaffer testified that he wanted to go into the mobilehome but 'they' wouldn't let him in there. Shaffer's counsel asked him why he wanted to go into the mobilehome, and Mr. Shaffer said, "I wanted to get a beer. I hadn't had any breakfast."

We could delineate the facts in further detail, but appellants devote only one sentence in their brief to the sufficiency of the evidence. For that reason, further detail about the gruesome and bizarre facts will be kept to a minimum.

## I

### A

The Riverton Volunteer Fire Department was called to the fire at 7:52 a. m. on November 9, 1979. The fire was extinguished by approximately 8:30 a. m. At approximately 8:30 a. m., Deputy County Coroner Edward McAuslan arrived at the scene and began taking photos for the Fremont County Coroner's Office. At substantially the same time Gary Pfisterer took some photographs of the fire scene for the Riverton Fire Department.

The Riverton Fire Marshal was out of state November 9 on official business. Between 9:00 a. m. to 10:00 a. m., Fire Chief Kenneth H. Crymble and County Coroner McAuslan discussed the situation and agreed to call the State Fire Marshal in Cheyenne to investigate the fire. The call was made about 10:00 a. m., and an investigator left Cheyenne immediately. It was estimated that the investigator would arrive from Cheyenne in about six to eight hours. Don Shatto, an investigator from Lander, arrived at about 10:30 a. m.. The State Fire Marshal had asked Mr. Shatto to assist in the investigation. The fire equipment was removed from the scene between 10:00 a. m. and 11:00 a. m. David Harrington, a deputy for the State Fire Marshal, arrived from Cheyenne between 3:30 and 4:00 p. m. According to Fire Chief Crymble, in a fire death situation only qualified firemen are allowed in and around the area. Officials present did not do much to determine the cause of the fire because they did not want to disturb anything before the State Fire Marshal's investigation. Chief Crymble testified that before calling the Fire Marshal he had observed nothing that caused him to suspect arson. He also testi-

fied that he and his men never left the scene unattended, and that at approximately 10:30 a. m. to 11:00 a. m. they roped the entire area off. Crymble and Fireman Wingert remained at the scene until Mr. Harrington arrived to secure it for the investigation. Crymble, Wingert and Shatto accompanied Harrington during his investigation, which he completed at approximately 5:00 p. m.[3]

■ Because no search warrant was obtained in connection with the fire investigation, the appellants made a suppression motion. Just before trial appellants again raised the issue of a warrantless search. They claimed that the fire investigation violated their rights under the Fourth Amendment to the United States Constitution and Article 1, § 4, Wyoming Constitution, which are identical:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized."

The trial judge denied the suppression motions and allowed David Harrington from the State Fire Marshal's office and others involved in the investigation to testify. Physical evidence taken from the mobilehome and pictures taken at the fire scene were also admitted into evidence.

**3.** Duties of the State Fire Marshal are set out in § 35–9–118(a), W.S.1977:

"The state fire marshal or the chief of the fire department of each city, town, or fire district in the state of Wyoming shall investigate the cause, origin and circumstances of each fire occurring in such city, town, or district by which property of a value in excess of five hundred dollars ($500.00) has been destroyed or damaged, and shall make an investigation to determine whether the fire was the result of carelessness or design. The investigation shall be commenced within two (2) days, not including Sunday if the fire occurred on that day, and the state fire marshal may superintend and direct the investigation if he deems it necessary."

Section 35–9–118(d), W.S.1977, states:

The appellants and the State both quote *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) and seem to agree that this case is the leading case in fire searches without a warrant. Since the relevant facts there are similar to the facts in this case, we will set out Justice Stewart's summary of the facts in detail:

"Shortly before midnight on January 21, 1970, a fire broke out at Tyler's Auction, a furniture store in Oakland County, Mich. * * * [T]he fire department responded to the fire and was 'just watering down smoldering embers' when Fire Chief See arrived on the scene around 2:00 a. m. It was Chief See's responsibility 'to determine the cause and make out all reports.' Chief See was met by Lt. Lawson, who informed him that two plastic containers of flammable liquid had been found in the building. Using portable lights, they entered the gutted store, which was filled with smoke and steam, to examine the containers. Concluding that the fire 'could possibly have been an arson,' Chief See called Police Detective Webb, who arrived around 3:30 a. m. Detective Webb took several pictures of the containers and of the interior of the store, but finally abandoned his efforts because of the smoke and steam. Chief See briefly '[l]ooked throughout the rest of the building to see if there was any further evidence, to determine what the cause of the fire was.' By 4:00 a. m. the fire had been extinguished and the firefighters departed. * * *

"The state fire marshal shall have the authority at all times of the day or night, in performance of the duties imposed by the provisions of this act [§§ 35–9–101 to 35–9–140], to enter upon and examine any building or premises where any fires or attempt to cause fires shall have occurred, or which at the time may be burning, and also the power to enter upon at any time any building adjacent to that in which the fire or attempt to cause fires occurred, should he deem it necessary in the proper discharge of his duties. He also may take full control and custody of the buildings and premises, and place such person in charge thereof as he may deem proper, until his examination and investigations may be completed."

"Four hours after he had left Tyler's Auction, Chief See returned with Assistant Chief Somerville, whose job was to determine the 'origin of all fires that occur within the Township.' The fire had been extinguished and the building was empty. After a cursory examination they left, and Somerville returned with Detective Webb around 9 a. m. * * * Somerville also searched through the rubble 'looking for any other signs or evidence that showed how this fire was caused.' Again, there was neither consent nor a warrant for these entries and seizures. * * *

"On February 16 Sergeant Hoffman of the Michigan State Police Arson Section returned to Tyler's Auction to take photographs. * * * Over the course of his several visits, Hoffman secured physical evidence and formed opinions that played a substantial role at trial in establishing arson as the cause of the fire * * *. His entries into the building were without warrants or Tyler's consent, and were for the sole purpose 'of making an investigation and seizing evidence.' * * * " *Michigan v. Tyler*, supra, 436 U.S. at 501, 98 S.Ct. at 1946, 56 L.Ed.2d at 493.

The majority in *Tyler*, supra, stated general principles of law as follows:

" * * * Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished. And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional." *Michigan v. Tyler*, supra, U.S. at 510, 98 S.Ct. at 1950, 56 L.Ed.2d at 498.

Justice White in his concurring and dissenting opinion best summarized this principle: " * * * The fire truck need not stop at the courthouse in rushing to the flames. * * * " *Michigan v. Tyler*, supra, 436 U.S. at 516, 98 S.Ct. at 1953.

In *Tyler* the High Court affirmed the Michigan Supreme Court in granting a new trial. It held that certain evidence obtained without a warrant violated the Fourth and Fourteenth Amendments. However, the entries that were condemned by the High Court were the entries of February 16, not the warrantless entries and reentries of January 22. The Court said:

"On the facts of this case, we do not believe that a warrant was necessary for the early morning re-entries on January 22. As the fire was being extinguished, Chief See and his assistants began their investigation, but visibility was severely hindered by darkness, steam, and smoke. Thus they departed at 4 a. m. and returned shortly after daylight to continue their investigation. Little purpose would have been served by their remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning. Under these circumstances, we find that *the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence.*

"The entries occurring after January 22, however, were clearly detached from the initial exigency and warrantless entry. Since all of these searches were conducted without valid warrants and without consent, they were invalid under the Fourth and Fourteenth Amendments, and any evidence obtained as a result of those entries must, therefore, be excluded at the respondents' retrial." (Emphasis added.) *Michigan v. Tyler*, supra, 436 U.S. at 509–512, 98 S.Ct. at 1950–1951.

In the case before us the officials may in fact have had better justification for handling the investigation in the way they did than did the officials in *Tyler*. In *Tyler* the fire chief arrived at the scene of the fire at about 2:00 a. m. Under his direction a police detective took pictures and did some investigative work. By 4:00 a. m. the firefighters had extinguished the fire and left. The fire chief and detective also left at about 4:00 a. m., taking evidence with them. At about 8:00 a. m., the fire chief and assistant fire chief reentered the building, made a cursory examination, and then again left the building. About an hour later, the assistant fire chief and a detective made still another entry and examination, and removed pieces of evidence. Under these facts the majority had no difficulty finding that the investigation later the same day was "an actual continuation of the first investigation." *Michigan v. Tyler*, supra, 436 U.S. at 511, 98 S.Ct. at 1951.

Here, Fire Chief Crymble arrived at the fire scene before 9:00 a. m. A volunteer firefighter took pictures for the fire department; a deputy coroner took pictures for the county coroner's office. Within an hour, the Chief decided to seek help from the State Fire Marshal's office, because the Riverton Fire Marshal, who normally handled fire investigations, was out of town. Chief Crymble and his people made a cursory survey of the situation. They roped off the entire area, and then Crymble and fireman Wingert waited at the scene until Mr. Harrington of the State Fire Marshal's office arrived from Cheyenne.

In *Tyler* there was hiatus between investigation of about four hours. There were also several reentries. In the case here

Chief Crymble and others involved in the investigation never left the scene. The scene was at all times attended and secure. We have no trouble finding a continuous investigation mandated by *Tyler*. We have indicated time frames that certain things happened in *Tyler* and the case here, to show certain similarities. We do not suggest that time is determinative, but hold that the exigencies of the situation determine whether a warrantless search is permissible.[4]

Appellants seek comfort in *People v. Holloway*, 82 Ill.App.3d 703, 37 Ill.Dec. 876, 402 N.E.2d 878, 881 (1979). In *Holloway* the fire was called in at 2:40 a. m. and extinguished at 7:00 a. m. Approximately 30 minutes thereafter the fire chief called the State Fire Investigator who lived about 30 miles from the fire scene. He arrived at 9:45 a. m. and entered the premises, but was unable to take any pictures because of smoke and steam. The State Fire Investigator reentered the premises at noon and caused pictures to be taken. The majority in *Holloway* maintained that *Michigan v. Tyler*, supra, sanctioned warrantless entry made only by the same personnel who had commenced investigation at or about the time of the original emergency. Thus, since the State Fire Investigator had not been present during the initial investigation and was not subject to the control and supervision of the fire chief, the court held that his later entry and investigation was invalid as not pursuant to a warrant.

We believe that the majority in *Holloway* have misconstrued the holding in *Michigan v. Tyler*, supra. We agree with Justice Trapp's dissent in *Holloway*, supra, which says that there is nothing in *Tyler* to sug-

---

**4.** *Michigan v. Tyler*, 436 U.S. 499, 510, n.6, 98 S.Ct. 1942, 1950, n.6, 56 L.Ed.2d 486 (1978), states:

"The circumstances of particular fires and the role of firemen and investigating officials will vary widely. A fire in a single-family dwelling that clearly is extinguished at some identifiable time presents fewer complexities than those likely to attend a fire that spreads through a large apartment complex or that engulfs numerous buildings. In the latter situations, it may be necessary for officials— pursuing their duty both to extinguish the fire and to ascertain its origin—to remain on the scene for an extended period of time repeatedly entering or re-entering the building or buildings, or portions thereof. In determining what constitutes a 'reasonable time to investigate,' appropriate recognition must be given to the exigencies that confront officials serving under these conditions, as well as to individuals' reasonable expectations of privacy."

gest that Assistant Chief Somerville, who entered the building at 8:00 a. m., had any prior association with the extinction of the fire or the investigation commenced by Chief See in the early morning around 4:00 a. m.

We conclude that Justice Trapp is correct when he summarizes this segment of the events in *Tyler*:

"Some four hours after leaving the scene of the fire, Chief See briefly returned with an assistant, Somerville, whose duty was to determine the origin of all fires. Nothing in *Tyler* suggests that Somerville had any prior association with the extinction of the fire or the investigation commenced by See in the early morning. An hour later Somerville returned with the police detective and the evidence was procured in due course through their joint efforts. * * *" *People v. Holloway*, supra, 82 Ill.App.3d 703, 37 Ill.Dec. 876, 880, 402 N.E.2d 878, at 882.

Justice Trapp then concluded:

" * * * The sequence of investigation described in *Tyler* does not actually support the conclusion concerning the same personnel and original emergency as stated in the language of the majority opinion." *People v. Holloway*, supra, 82 Ill.App.3d 703, 37 Ill.Dec. 876, 880, 402 N.E.2d 878, at 882.

The majority in *Holloway* have assumed that the entries and reentries made by Chief See and those helping him in *Tyler* were made by the same people. There is no basis for this assumption in the opinion. The majority in *Holloway* have "bootstrapped" the holding in *Tyler* to conclude that initial and subsequent investigations must be conducted by exactly the same people to be a continuous, and therefore permissible, investigation. This is not what *Tyler* holds. Other cases cited by appellant recite abstract principles regarding warrantless searches. These cases are factually different than the case at bar and therefore have little value.

Courts have upheld searches in cases where the facts are factually similar to this one. *Romano v. Home Insurance Company*, 490 F.Supp. 191 (N.D.Ga.1980) permitted a warrantless reentry upon return with another fire official at daybreak after the first official had left the fire scene at about 2:00 a. m. *United States v. Callabrass*, 607 F.2d 559 (2nd Cir. 1979), cert. denied 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980), justified the entry of a police detective who was not present at the fire. *In Cleaver v. Superior Court of Alameda County*, Cal., 24 Cal.3d 297, 155 Cal.Rptr. 559, 594 P.2d 984, 987 (1979), the court indicated that the *Tyler* facts extended a reasonable time to investigate to seven hours, based on how they understood the facts in that case.[5]

Appellants also argue that Deputy Coroner McAuslan's investigation on the morning of the fire was not in conjunction with any exigent circumstances obviating the warrant requirement. Appellants cite *United States v. Hoffman*, 607 F.2d 280 (9th Cir. 1979) for the proposition that a police officer may not make a warrantless entry pursuant to the initial entry of the fire fighters when no exigent circumstances exist under *Michigan v. Tyler*, supra. The undisputed testimony here indicated that McAuslan arrived at the scene at approximately 8:33 a. m., less than an hour from the time the fire call was received. At that time he began taking photographs on behalf of the coroner's office and assisting the Fremont County Sheriff's office at its request. *United States v. Hoffman*, supra, is also distinguishable in that the seizure of evidence used to convict the defendant in *Hoffman* was unrelated to the fire and its causes.

In any event, *Michigan v. Tyler*, supra, allows both firemen and police to investigate if there are exigent circumstances. In *Tyler*, the fire chief summoned a police detective to investigate possible arson at

5. See also *People v. Calhoun*, 49 N.Y.2d 398, 426 N.Y.S.2d 243, 402 N.E.2d 1145 (1980); and

*State v. Hansen*, Iowa, 286 N.W.2d 163 (1979).

approximately 2:00 a. m. After the investigation was hampered by smoke and steam, Detective Webb returned at 9:00 a. m. with Assistant Chief Somerville. In the case here, Deputy Coroner McAuslan entered the premises at or about the same time the fire was finally extinguished. Given the fact that Robbie Shaffer's body was still inside the premises, and that the fire had apparently caused the death of Glenn and Opal Shaffer, exigent circumstances existed, as in *Tyler,* for the coroner to investigate immediately. McAuslan's entry was justified for the same reason that a fireman's entry is justified. His immediate presence was necessary to public safety and to lessen the danger of destruction or loss of evidence which would aid in the investigation of the cause of death. It also provided for less interference with the Shaffers' privacy and with their recovery efforts. Thus, McAuslan's entry in the present case was within the proscriptions of the Fourth Amendment as defined in *Michigan v. Tyler,* supra.

### B

■ The appellants also object to the admissibility of the evidence obtained by Deputy Sheriff Don Oliver in an interview with James Shaffer the day of the fire. The evidence presented at the suppression hearing indicates that Oliver returned to the mobilehome around 1:30 p. m. the day of the fire. He asked Mr. Shaffer if he could ask him some questions to obtain information on the dates of birth of his family. He also asked Mr. Shaffer to come to the patrol car so that they could be seated. Mr. Shaffer said, "That will be fine, I'll do whatever I can do." Mr. Shaffer sat in the front passenger's seat; Oliver sat in the driver's seat of the patrol car. Mrs. Shaffer was standing outside the vehicle. Oliver asked if he could make a recording of the interview, and Mr. Shaffer said, "That would be fine." Oliver did not advise Shaffer of his constitutional rights under *Miranda,* infra, before the interview. It was Oliver's position that he was not conducting a criminal investigation at that time. Oliver simply needed names and general information to fill out his report. The court denied a

motion to suppress the interview which Mr. Oliver taped on November 9, 1979. The tape recording of the interview was received into evidence as Exhibit S194 and played to the jury.

In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 705 (1966), cert. denied 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122 (1969), the Supreme Court held:

> "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

In *Miranda v. Arizona,* supra, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room where he was cut off from the outside world, thus indicating an incommunicado interrogation in a police-dominated atmosphere. In *Miranda,* supra, at 384 U.S. 477–478, 86 S.Ct. 1629, 16 L.Ed.2d 725, the Court made this distinction:

> " * * * General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present."

The Court also said:

> " * * * Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. * * * Volunteered statements of any

kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda*, supra, 384 U.S. 478, 86 S.Ct. 1630, 16 L.Ed.2d 726.

The above quotations indicate that the requirements of *Miranda*, supra, with respect to warning a suspect of his constitutional rights before questioning apply only where there is a custodial interrogation. *Sanville v. State*, Wyo., 553 P.2d 1386 (1976). In *Sanville*, this Court said at page 1389:

" * * * The facts surrounding the events about which Sanville complains demonstrate clearly that there was no custodial interrogation of Andrew Sanville by the police officer. [Citation.] The police officer was investigating a burglary, and was simply interested in trying to establish the source of the tools which Sanville had in his pickup. There is no indication even that Sanville was a suspect at that stage of the investigation. Since he was not in custody, and the responses elicited clearly were voluntary, and the officer was engaged in general questioning in the fact finding process, there was no violation of Sanville's constitutional rights. * * * "

Generally, the interrogation of suspects conducted by peace officers while in or near police vehicles is not custodial interrogation requiring the *Miranda* warning. The rationale for this principle is that the person being questioned is not subject to restraints and is not in custody when being interviewed. One is not in custody of police unless it can be fairly said that his freedom of movement has been involuntarily curtailed by force or immediate threat of force from the police. Annot. 31 A.L.R.3d 565, § 14(b) (1970). Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Annot., 10 A.L.R.3d 1054, § 4 (1966).

The appellants cite *Dryden v. State*, Wyo., 535 P.2d 483, 490 (1975), with regard to "voluntary statements." This quotation,

however, is only applicable to in-custody statements. There is no showing that the appellant here was in custody. The facts of the present case show that the interview with Mr. Shaffer took place several hours before any significant investigation by the State investigator took place. At the time of the interview, arson had not been established as a cause of the fire. With arson only a possibility, Mr. Shaffer was not suspected of any criminal activity, and the interview was not a custodial interrogation. The interview was merely a fact-finding process involving general on-the-scene questioning. Mr. Shaffer was not subject to any physical restraints. He was free to leave the interview at any time. The interview was conducted in the police car merely as a matter of convenience. *State v. Caha*, 184 Neb. 70, 165 N.W.2d 362 (1969), cert. denied 397 U.S. 939, 90 S.Ct. 949, 25 L.Ed.2d 119 (1970). Thus, *Miranda* warnings were not required.

## II

■ Appellants object to the admission of State's Exhibit No. 7, a photograph of the charred body of Robbie Shaffer, saying that the photograph was inflammatory and prejudicial. We said in *Reeder v. State*, Wyo., 515 P.2d 969, 973 (1973), mandamus denied, 419 U.S. 1018, 95 S.Ct. 509, 42 L.Ed.2d 303 (1974):

" * * * Photographs are admissible if they correctly portray the subject matter, do not convey false impressions, and if their probative value is such as to outweigh the possibility of undue prejudice from such circumstances as their gruesome character. * * * "

We also stated the rule there and in *Key v. State*, Wyo., 616 P.2d 774 (1980), that reversal is required for the admission of a photograph only if the photograph has little or no probative value and is extremely inflammatory or introduced merely to inflame the jury.

Here, the picture did have some probative value. The photograph was relevant to the issue of the cause of Robbie's death, and therefore to the issue of the motive for the

arson. The State's theory was that Robbie was dead before the fire started, and that the Shaffers started the fire to cover up Robbie's death. To show that motive, it introduced evidence that Glenn and Opal both had carbon monoxide levels of over 70 percent in their blood after death, but that Robbie only had a carbon monoxide level of three percent in his blood, indicating he had already stopped breathing before the fire started. Appellants countered by saying that the presence of soot particles in tissue samples taken from Robbie's body proved that Robbie had indeed been breathing when the fire started. The State claimed that the soot particles, if there were any, resulted from contamination of the samples during autopsy. The State argued for the introduction of the photograph to show the probability of tissue-sample contamination caused by the charred condition of Robbie's body.

We said in *Elliott v. State*, Wyo., 600 P.2d 1044, 1048 (1979):

"' * * * [M]otive has been well enough described as "that which leads or tempts the mind to indulge in a criminal act," and it is something that may be resorted to as a legitimate help in arriving at the ultimate act in question. * * * ' " (Citing *Thompson v. United States*, 144 F. 14, 18 (1st Cir. 1906)).

Although the prosecution does not have to offer evidence of motive, such evidence is relevant and admissible, and the trial court has a wide range in permitting the introduction of evidence which tends to show a motive. See 1 Wharton's Criminal Evidence, § 170 (1972), and the cases cited therein. This photograph was therefore relevant. Nevertheless, a photograph, even if relevant, is not always admissible. When a party objects to admission because the photograph is unduly prejudicial under Rule 403, W.R.E.,[6] the judge must weigh the probative value of the photograph against its possible prejudicial effect. Conceivably,

the picture of Robbie's body was not essential to show the probability of contamination, but it complemented or at least made more understandable the pathologist's testimony. One pathologist who testified for the State said that Robbie's body was charred and the skin surface was covered with soot and carbonized flesh. Another pathologist who testified for the State said that he had a problem during the autopsy with soot contamination of his gloves and instruments. That pathologist also testified that State's Exhibit No. 13, a photograph of Glenn Shaffer's body, showed the presence of soot on the autopsy table.

State's Exhibit No. 7, while not gory, is grotesque. It shows what was once a 21-month old baby as a now unrecognizable lump of charred flesh. For that reason, the possible prejudicial effect of the picture arguably could have outweighed its probative value, although reversal is certainly not appropriate. Absent a clear abuse of discretion, we will not upset the trial judge's ruling on the admission of a photograph. *State v. Lindsay*, 77 Wyo. 410, 317 P.2d 506 (1957). Further, the other evidence here was sufficient to support the jury's finding of the Shaffers' guilt, and questionable evidence which in a more doubtful case might be grounds for a new trial, may be disregarded as not prejudicial. *Reeder v. State*, supra; *Espy v. State*, 54 Wyo. 291, 92 P.2d 549 (1939). The prosecutor, although his conduct of the trial was otherwise commendable, did become overzealous in the use of the photograph, but the photograph depicted just one more disgusting detail in a case full of disgusting details. The jury listened to and saw nothing but the bizarre and the gruesome during eight days of the trial. The photograph, State's Exhibit No. 7, portrayed what had been orally described. In fact the photograph depicted exactly what appellant Jim Shaffer had said, "Robbie's cremated * * *." In view of all the hideous matters brought before the jury, it is improbable that they could have been further

6. Rule 403, W.R.E.:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

inflamed by seeing the photograph. Appellants will not be granted a new trial simply because of the admission of the photograph into evidence.

Even though we have ruled that admitting the photograph here was not prejudicial, we want to make it clear that in some other case where the evidence might be of more questionable sufficiency than in this one, the State could be flirting with reversal by using such photographs. The State may not use at will any and all pictures at a murder trial merely because they possess some relevancy. As another court put it: "When undoubtedly the minute peg of relevancy will be entirely obscured by the quantity of dirty linen hung upon it, fair play directs the exclusion of the exhibit." *State v. Bucanis*, 26 N.J. 45, 138 A.2d 739 (1958), cert. denied 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958), (citing *State v. Goebel*, 36 Wash.2d 367, 218 P.2d 300 (1950)). Murder is repugnant, but the State has to prove its case without using the transparent tactic of trying to sicken or seriously disturb the composure of the jury in the name of relevance.

### III

The State proceeded on the theory that Robbie Shaffer was dead before the fire, and that the fire was deliberately set to cover up his death; it then produced medical opinions to that effect. These opinions were based on the fact that the carbon monoxide level in the body of Robbie Shaffer was "nearly negative," and on the fact that there was no soot in the air passageways which could be seen by the naked eye. The State's theory was that soot and particles would have been inhaled if Robbie had been breathing at the time of the fire.

An autopsy on Robbie Shaffer's body revealed a hemorrhage on the back wall of the esophagus, and also on the right side of the carotid artery. Medical opinion was produced that these hemorrhages were caused before death. According to Dr. James Thorpen, the State's pathology expert, such hemorrhages could have been caused by "blunt force trauma, and this might have occurred as from a blow, a blow to the neck, a compression, a forceful compression of the neck, such a thing as might occur with a manual strangulation."

As part of the defense case in chief, appellants produced the testimony of Dr. William Fogarty. He was not present at either autopsy on the body of Robbie Shaffer, but he examined laboratory reports, medical reports, pictures, and slides, and talked to the pathologist involved in both autopsies. Dr. Fogarty testified that in his opinion Robbie Shaffer was alive and breathing at the time of the fire, and died as a result of the fire. He based his opinion on the fact that microscopic soot particles were found in the bronchial mucous, and that the tonsil tissue was burned. Dr. Fogarty explained the very low carbon monoxide level in the blood of Robbie Shaffer as follows:

"A. A person can die in a fire very rapidly due to certain reflexes which may interrupt breathing or heart action called vagal reflexes. And this is caused usually by either toxic or noxious gases or by breathing in very hot air.

"Q. And during these vagal reflexes is it common for the throat to restrict oxygen and cut off the flow of air?

"A. Yes, that's called laryngospasm."[7]

Dr. Fogarty stated that "at an autopsy there is no evidence of laryngospasm." He also suggested possible causes of hemorrhage in the neck of Robbie different from those suggested by the State's medical experts. He stated that the hyoid bone is almost always fractured during a strangulation maneuver. He also interpreted certain exhibits in evidence, suggesting that they were inconsistent with strangulation or suffocation before the fire.

---

7. "Laryngospasm (same as laryngismus): Schmidt's Dictionary of Medicine, Vol. 2, p. L–20 (1981):
"Laryngimus: 'A spasm of the larynx, i.e., an involuntary contraction of the muscles of the larynx. * * * ' " Id. p. L–18.

See also Stedman's Medical Dictionary, p. 683 (Third Unabridged Lawyers' Edition (1972)).

The foregoing summary of the medical testimony concerning the time of Robbie Shaffer's death is a preface to appellant's third assignment of error, which is that the trial judge committed prejudicial error by allowing the State to call an expert to testify during the defense case in chief.

The last witness who testified for the defense was appellant Karin Shaffer. After the direct examination of Mrs. Shaffer, defense counsel called Mary Jane Thompson out of turn.[8] The State then called Dr. George O'Gura, who testified over appellants' objections. After Dr. O'Gura testified, Karin Shaffer again took the witness stand for cross-examination and redirect. Thereafter, the defense rested.

Appellants contend they were prejudiced in several ways when the court allowed Dr. O'Gura to testify out of turn. They say that the witness was not previously disclosed to them in accordance with pretrial orders; that the testimony was either cumulative or presented a new matter not rebuttable in surrebuttal due to their lack of financial resources; that it permitted the State to outnumber the defense with experts and financial resources; that it interrupted the presentation of their case in chief; and that the court let the testimony in only in consideration for the prosecutor. They contend that under § 7–11–201, W.S. 1977, infra, the court had no discretion to allow witnesses to testify out of turn. They further argue that if the matter is discretionary, the court abused its discretion by allowing the testimony.

The State countered that Dr. O'Gura was called to rebut matters testified to by Dr. Fogarty, appellants' expert pathologist. The State further maintained that they were calling Dr. O'Gura out of order because he had to be in federal court in Denver the next day, and had to catch a plane at 5:00 p. m.[9]

Dr. O'Gura's testimony was a mixture of cumulative testimony and proper rebuttal testimony. However, rebuttal testimony in isolation would have been difficult for the jury to follow and understand. For Dr. O'Gura's testimony to make sense, it was necessary to produce cumulative testimony as a foundation or starting point for proper rebuttal testimony.

Dr. O'Gura testified that in his opinion Robbie Shaffer was dead at the time of the fire. His testimony rebutted Dr. Fogarty's testimony with respect to vagal reflexes triggering laryngospasm and causing Robbie's death. Dr. O'Gura had a different opinion because of the nature of the fire. He stated that in a fire where an accelerant is used (gasoline, kerosene, etc.), a flash fire results. The gist of Dr. O'Gura's opinion was that in the case of a flash fire with intense heat, vagal reflexes are possible; but, in the case of a slow burning fire, vagal reflexes are ruled out. Dr. O'Gura understood that the fire in the Shaffer mobilehome was the slow burning type. There was evidence to support this premise, and no evidence that it was a flash or intense heat fire. Dr. O'Gura also discounted vagal reflexes in Robbie Shaffer caused by toxic fumes. He also was of the opinion that there was no evidence of soot in Robbie's upper airways and that the trace of carbon in the lower portion of the trachia was insignificant. Dr. O'Gura had seen "quite a few flash fires," but he had never seen nor heard of vagal reflexes or laryngospasm associated with fire. For the most part, Dr. O'Gura's testimony was to rebut Dr. Fogarty's.

Section 7–11–201, W.S.1977, provides in part:

"(a) After the jury has been impaneled and sworn, the trial shall proceed in the following order:

---

8. It was expected by defense counsel that the testimony of Mary Jane Thompson would precede the testimony of Karin Shaffer. However, witness Thompson was not available to testify in expected order; therefore, she was called after Karin Shaffer's testimony on direct examination.

9. The record does not reveal the exact time Dr. O'Gura was called as a witness, but apparently there was about two hours for Dr. O'Gura to testify and catch his 5 o'clock plane.

"(i) The counsel for the state must state the case of the prosecution, and may briefly state the evidence by which he expects to sustain it;

"(ii) The defendant or his counsel may then state his defense and may briefly state the evidence he expects to offer in support of it, or may wait until the evidence on the part of the state is closed;

"(iii) The state must first produce its evidence; the defendant will then produce his evidence;

"(iv) The state will then be confined to rebutting evidence unless the court, for good reasons, in furtherance of justice, shall permit it to offer evidence in chief;"

The general rule with regard to the order of proof is stated in 75 Am.Jur.2d, Trial, § 146 (1974):

"The general rules for the introduction of testimony must be so often applied or relaxed, according to circumstances apparent only to the trial court, that a strict uniformity at all times is not to be expected, and in some instances would prove unjust. Whether there shall be a departure from the usual order of proof is a matter addressed to the sound discretion of the trial court, and an appellate court will interfere only where there is an abuse of discretion. For example, the allowance of evidence to be introduced in rebuttal, which should have been offered in chief, will not be inquired into unless a clear abuse of discretion appears. It has even been said that the reception of evidence out of order is not subject to revision or exception. And failure to follow the regular order of proof has generally been held not to be reversible error unless it is prejudicial."

█ The order of trial set out in § 7–11–201, W.S.1977, should be followed so that an orderly presentation to the jury might be made, but it would come as a surprise to the Bar of this state if we were to hold that there could be no deviation from the order of trial set out in § 7–11–201, supra. It is necessary from time to time to take wit-

nesses out of order so that parties or witnesses can be accommodated, or in the interest of justice. Lawyers find that it is not always possible to present evidence in the logical way set out in the statute. It has always been the practice in Wyoming to take witnesses out of order, provided it can be shown to the court that it is reasonably necessary. We believe that the trial court's determination to permit witnesses to testify out of order is a discretionary matter with the court, and should not be disturbed on appeal, unless it can be clearly shown that the trial court abused its discretion. The party who resists taking a witness out of turn has the burden to demonstrate that he has been prejudiced and that the trial judge has abused his discretion.

In *Strand v. State*, 36 Wyo. 78, 85, 252 P. 1030 (1927), after the defense had rested, the State was permitted to introduce evidence that was properly a part of its case in chief. The court held:

" * * * This was a matter within the discretion of the trial judge, and we think the discretion was not abused. [Citations.] There is nothing in the record to show that defendant was denied the right to meet this evidence by reopening his case, or that he was not then as well prepared to meet it as he would have been if it had been introduced in its regular order."

The court in *Strand v. State*, supra, referred to W.C.S.1920, § 7532, 4th paragraph, which is identical to § 7–11–201(a)(iv), W.S.1977. In *Barbee v. State*, Tex.Crim., 432 S.W.2d 78, 83 (1968), cert. denied 395 U.S. 924, 89 S.Ct. 1779, 23 L.Ed.2d 241 (1969), reh. denied 396 U.S. 870, 90 S.Ct. 42, 24 L.Ed.2d 127 (1969), the court excused a witness after he had been called out of order because he had to go to the hospital. The appellant had an opportunity to examine the witness, but declined. The court held that there was no error.

Wigmore on Evidence says:

"On the other hand, the proponent himself, in connection with his cross-examination of a witness of the opponent and before the latter has rested his case in

reply, may be allowed in advance to put in part of his case in rebuttal. * * * " 6 Wigmore, Evidence § 1872, pp. 671–672 (Chadbourn rev. 1976). See, *Ranney v. St. Johnsburg and L. C. R. R. Co.*, 67 Vt. 594, 32 A. 810 (1895).

In *Thiede v. People of Territory of Utah*, 159 U.S. 510; 16 S.Ct. 62, 40 L.Ed. 237 (1895), the Court held, "The order in which testimony shall be admitted is largely within the discretion of the trial court. * * * "

Counsel for respective parties do not cite cases which contain the same factual circumstances presented here. However, in our own research we have found a case somewhat in support of appellants' argument. In *State v. Hunt*, Mo., 335 S.W.2d 506 (1960), during defendant's case in chief the trial court interrupted the cross-examination of the defendant, and directed the defendant to step aside and directed the prosecuting attorney to recall state's witnesses to rebut defendant's testimony.[10]

The Kansas City Court of Appeals in Missouri disapproving this procedure said:

"* * * The plain and practical effect of his action, even though unintended, was to materially prejudice the defendant in making his defense. It deprived the defendant of his right to put on his defense in an orderly manner free of unreasonable and deliberate interruption of a highly prejudicial nature. It gave an unfair advantage to the State's case by interrupting the defendant's testimony midway, to defendant's obvious disadvantage, to allow two officers to be recalled to give testimony beyond their own testimony in chief, contrary to and in rebuttal of defendant's interrupted testimony, reserving the third officer's testimony for later rebuttal. This testimony taken out of order not only improperly overemphasized the State's evidence but also, when coupled with the comments of the court, had the effect of an unfavorable judicial comment on the credibility of the defendant as weighed against the credibility of

the officers. * * * " *State v. Hunt*, supra, at 510.

■ The case here is distinguishable from *State v. Hunt*, supra. Appellants, not the State, interrupted the testimony of Karin Shaffer by calling Jane Thompson after Mrs. Shaffer had finished testifying on direct examination. It was only after this interruption that the State called Dr. O'Gura out of turn. The appellants were finished with the testimony of Karin Shaffer. On redirect counsel asked Mrs. Shaffer three innocuous questions that had nothing to do with any issues in this case. In reality, there was no interruption of the testimony of Karin Shaffer as far as appellants were concerned. In *State v. Hunt*, supra, there was not the necessity of calling a witness out of turn to accommodate the witness as was the situation with Dr. O'Gura. Also, there were prejudicial comments by the trial judge regarding the credibility of a witness, which did not occur here.

We hold that, given the facts in this case, the trial judge did not abuse his discretion by allowing the State to produce rebuttal testimony before appellants had rested.

IV

Appellants' fourth assignment of error is that denial of a motion for a change of venue, refusal to dismiss certain jurors for cause, and failure to sequester the jury, created cumulative errors which were prejudicial to them.

A

■ This case received extensive news coverage, not only locally, but statewide. In support of their motion for a change of venue, appellants presented to the trial court defendants' Exhibit A. This exhibit contains 53 newspaper clippings from November 9, 1979, to October 23, 1980. The clippings are mostly from the local newspaper, the Riverton Ranger. Appellants do

---

**10.** Missouri had an order of trial statute, § 546.070, V.A.M.S.1949, in some respects similar to § 7–11–201, W.S.1977.

not point out anything in these newspaper articles that is nonfactual, inflammatory or prejudicial. Our own examination of these news articles does not reveal any prejudicial material. On the contrary, they appear to exhibit responsible newspaper reporting. Extensive news coverage does not automatically require a change of venue.

Voir dire was extensive and thorough. Approximately three hundred pages of the transcript records the voir dire. As would be expected, the jury panel had heard about the case. Some thought they would have trouble or be uneasy because the case involved young children. One juror thought it would be very difficult to pick a jury in Fremont County. That was not the case, however. No unusual difficulty was encountered in selecting a jury.

Rule 23(a), W.R.Cr.P., governing change of venue, provides, inter alia:

"The court upon motion of the defendant made at least 15 days prior to the date set for trial, shall transfer the proceeding as to him to another county, whether or not such county is specified in the defendant's motion, if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

This Court has had occasion to address the change of venue problem before. Recently we said in *Collins v. State*, Wyo., 589 P.2d 1283, 1289 (1979):

"Under the criminal rule, in order for a change of venue to be granted, the burden is upon the defendant to show prejudice so great or general as to prevent his receiving a fair and impartial trial and the decision is within the sound discretion of the trial judge. [Citations.] * * *

"Where newspaper articles and radio news accounts are largely factual rather than inflammatory, they cannot be considered prejudicial. [Citations.]

" * * * Even if any juror was aware of, and could recall, the facts as reported by the news media, there is no requirement that such a person be totally ignorant of the facts and issues involved. [Citations.]"

The record does not reflect the news articles to be other than fair and objective. The ultimate test in the propriety of change in venue is what is revealed in voir dire of the jury panel. Here no problems or difficulties were encountered. An unbiased and openminded jury was ultimately selected. The appellants did not convince the trial judge that a change of venue was justified. We do not think the trial judge abused his discretion in denying a change of venue. Appellants failed to meet their burden in the trial court and in this court.

B

Although appellants assign as error the court's failure to dismiss jurors for cause, they do not address this matter in their brief. We therefore would be justified in disregarding this assignment of error. We note, however, that the court denied one of appellant's challenges for cause. Ms. Fleming, a prospective juror, stated that she had an opinion or partial opinion, but properly did not state what that opinion was. Ms. Fleming, however, swore that she could impartially try the case according to the law and the evidence, notwithstanding such opinion.

Section 7–11–105, W.S.1977, provides in part:

"(a) The following shall be good cause for challenge to any person called as a juror on any indictment:

* * * * * *

(ii) That he has formed or expressed an opinion as to the guilt or innocence of the accused, or is biased or prejudiced for or against the accused."

Section 7–11–106, W.S.1977, provides:

"In the trial of criminal cases it shall not be cause for challenge that a person called to act as a juror has formed or expressed an opinion as to the guilt or innocence of the accused from newspaper reports and rumor, or from either of them, if such person swear that he can impartially try the case according to the

law and evidence notwithstanding such opinion."

In any event, Ms. Fleming was not on the jury panel that actually tried the case. Appellants did not allege that because of the court's ruling they were forced to exercise a peremptory challenge to remove Ms. Fleming from the jury.

### C

■ Appellants requested that jury be sequestered during the entire trial. The trial court denied this request. The jury, after being instructed and during their deliberations, was sequestered. Before deciding against sequestration, the trial court assured itself that the prosecution was not seeking the death penalty against either defendant.

Other than the limitation of § 7–11–210, W.S.1977,[11] sequestration is a discretionary matter with the trial court. At each recess, the court properly admonished the jury in detail. As in *Collins v. State*, supra, publicity during the trial was factual. However, there was no indication in the record that any juror ever violated the court's repeated instructions by viewing media coverage. Therefore, "in the absence of a showing of prejudice, permitting separation of a jury does not vitiate a conviction." *Collins v. State*, supra. This Court will not presume error.

Appellants urge that in the event we do not determine any alleged error to be of sufficient magnitude to require a reversal, then we should reverse because the cumulative effect of the errors claimed denied the appellants a fair trial. In support of this nebulous theory, appellants cite *Alcala v. State*, Wyo., 487 P.2d 448 (1971); and *State v. Stafford*, 213 Kan. 152, 515 P.2d 769 (1974). In *Alcala v. State*, supra, the court

recognized the cumulative error concept, but did not find cumulative error. In *State v. Stafford*, supra, the court found cumulative error based on three separate errors, all raised at trial, and ordered a new trial. In any event, cumulative error has no application here since there was no error in denying appellants' motion for a change of venue, failure to dismiss jurors for cause and nonsequestration of the jury.

### V

Finally, appellants contend that the trial judge and prosecuting attorney made improper comments, and that a mistrial should have been declared.

The appellants called Mary Jane Thompson as a witness to provide impeachment testimony of three prosecution witnesses. Ms. Thompson had been a deputy with the Fremont County Sheriff's Office in December, 1979. She had helped investigate the fire at appellants' mobilehome by interviewing several local residents. At the time of the interviews, Ms. Thompson made a memorandum of the discussions. By her testimony on the stand, and by referring to the memorandum, the defense sought to show prior inconsistent statements of the prosecution witnesses, Earl Ray Case, Steven Hays and Kim Oberlie. On cross-examination of Ms. Thompson, the prosecution elicited testimony concerning handwritten statements of each witness which were made at Ms. Thompson's request. These handwritten statements were offered as State's exhibits S212, S213 and S214 to show prior consistent statements by each of the three prosecution witnesses.[12]

To the prosecution's offer of S212, S213, S214, the defense made the following objection:

11. "The proceedings provided by law in civil cases as to the conduct of the jury, the admonitions of the court, and the manner of returning the verdict, shall be had upon all trials on indictments, so far as the proceedings may be applicable, and when it is not otherwise provided. In the trial of capital cases the jury shall not be permitted to separate, after being sworn, until discharged by

the court. In other felonies and misdemeanors, the separation of the jury may be permitted in the discretion of the court, until charged, after which no separation shall be allowed until discharged."

12. This manner of rehabilitation is provided for under the Wyoming Rules of Evidence, Rules 801(d)(1)(B), W.R.E., and 806 W.R.E.

"MR. HOOPER: Your Honor, I would object to all these statements on the basis, number 1, the witness has been here and testified and that the only purpose of this witness was to bring out that matter which this witness heard that witness say which they denied saying in the courtroom.

"Now, this is merely repetitive, it's cumulative, and contains matters other than what was testified to."

In ruling on the objection the court stated:

"THE COURT: This witness has said that's the best evidence of what was said and wrote some—how many pages are there?

"THE WITNESS: A whole bunch, I couldn't begin to tell you. I didn't count them.

"MR. HOOPER: May I approach the Bench for a second?

"THE COURT: Well, no, not right now. There are parts in there you don't want the jury to read?

"MR. HOOPER: Well, it's illegible.

"THE COURT: I'll determine that when the jury leaves, but as far as the admissibility all three Exhibits, 212, 213 and 214 are received in evidence."

▪ Appellants characterize the trial judge's remarks as a comment that "certain evidence (exhibits) contained matters which defense counsel did not want the jury to hear." In context the remarks were really an inquiry as to what the exhibits contained that counsel was objecting to. After objectionable portions of the exhibits had been identified by counsel for appellants, they were excised. Appellants do not assign as error the admission of these exhibits. No objection was made by either defense counsel to the court's remarks, nor was any motion for a mistrial made at that time. A recess was declared minutes after the allegedly prejudicial comment. During the recess no objection was made, no instruction was requested, nor did appellants move for a mistrial. A motion for a mistrial was made, however, after the State and defense had rested, and the jury had been excused for the day.

Appellants have not urged plain error. After examining the record and case law we conclude that the judge's remarks do not constitute plain error.

Both Rules 49(b), W.R.Cr.P. and 7.05, W.R.A.P. provide:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

In *Jones v. State*, Wyo., 580 P.2d 1150, 1153 (1978), we said:

"The 'plain-error' doctrine will be applied only where the error seriously affects the fairness or integrity of judicial proceedings. [Citation.] There must be a transgression of a clear and unequivocal rule of law, in a clear and obvious way, which adversely affects a substantial right. *Hampton v. State*, Wyo., 558 P.2d 504. See, *Todd v. State*, Wyo., 566 P.2d 597; and *Daellenbach v. State*, Wyo., 562 P.2d 679."

The judge's remarks were, at most, so fleeting, innocuous and inartfully phrased that they went unnoticed by everyone until late in the trial. They fall far short of being of the magnitude to constitute plain error, if they constitute error at all. Further, we believe that appellants' inexcusable and unreasonably delayed objection to the judge's remark constituted a waiver of any error. *Leeper v. State*, Wyo., 589 P.2d 379 (1979); and *Valerio v. State*, Wyo., 429 P.2d 317 (1967).

▪ Appellants contend that during summation the prosecutor commented on facts not in evidence and made statements of his personal opinion of appellants' guilt. Appellants objected to only one comment made by the prosecutor, which objection was overruled.

The portion of the prosecutor's closing argument objected to is:

"The defense suggested in their opening statement that what did these people have to gain. They didn't have any insurance. We are not dealing with that

type of a case. It's not uncommon for a motive for arson to be fear of misinterpretation of an accidental death. People have set fires to cover something like that when they were afraid that that might be misinterpreted * * *."

We follow the general rule and hold that the trial court must necessarily have discretion. This discretion will not be disturbed unless there is a clear abuse. *Oldham v. State*, Wyo., 534 P.2d 107, 113 (1975). The function of argument is more than a bare recitation of the testimony produced at trial. It is to assist the court and jury by pointing out, not only the evidence, but the conclusions which may be fairly drawn from such evidence. *Ross v. State*, 8 Wyo. 230, 57 P. 924, 927 (1899). Wide latitude is allowed in discussing inferences to be drawn from the evidence. *State v. Adams*, 1 Ariz.App. 153, 400 P.2d 360 (1965). While counsel may not be free to express a personal opinion on the ultimate issue of guilt or innocence of the accused, it is accepted practice for counsel to comment on the state of the evidence and to assist the triers of the fact in discerning between reasonable and unreasonable inferences. *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied, January 28, 1982; *Mayer v. State*, Wyo., 618 P.2d 127 (1980); *Boyd v. State*, Wyo., 528 P.2d 287, 292 (1974), cert. denied 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975).

The line between acceptable and unacceptable argument is not always clear; nevertheless, the trial court enjoys the best opportunity to judge questionable remarks in light of the entire context of the trial and concluding arguments. We agree with the trial judge that the prosecutor did not comment on the guilt of appellants. His remark appears to be a feeble attempt to point out a reasonable inference to be drawn from the evidence.

Appellants cite the page numbers in the record where they claim that the prosecutor made other improper remarks. Appellants do not identify the alleged improper remarks, nor do they cite us any cases in support of their theory that the prosecutor's remarks were improper and prejudicial. These unidentified prejudicial remarks were first brought to the attention of the court in connection with a motion for a new trial. Absent proper and timely objections made to inform the court of appellants' position about comments by the prosecutor, and absent cogent argument or the citation of applicable case law, we are left to speculate on what errors were committed and their effect. We conclude that the State's closing argument was within the bounds of fair comment. *Mayer v. State*, supra; and *Hopkinson v. State*, supra.

## VI

In assignment of error No. V, appellants question only cursorily and in passing the sufficiency of the evidence. In the concluding paragraph of their brief, they allege that "the evidence is insufficient to sustain their (appellants') conviction." Appellants make two bare statements in their brief that the evidence is insufficient to sustain the conviction. We have not been favored with a single citation, nor any argument cogent or otherwise, in support of the sufficiency of the evidence issue. Appellants do not point out any element of the offenses that they contend was not proved. They do not bring to our attention any deficiency in the State's evidence. We conclude that the issue, "sufficiency of the evidence," if it ever was an issue, has been abandoned by appellants because of their failure to point out any deficiencies, cite any cases, or make any argument.

Further, our review of the record reveals that from evidence produced by the State, the jury could reasonably find, as they apparently did, that:

"1. The antemortem wounds on Robbie Shaffer's neck occurred before the fire.

"2. Robbie was dead before the fire started.

"3. The fire originated under or very near Robbie's crib.

"4. The fire was not accidental and was in fact deliberately set."

We said in *Harris v. State*, Wyo., 487 P.2d 800, 801 (1971):

"In passing upon the sufficiency of the evidence to support a verdict of guilty, an appellate court will not weigh conflicting evidence nor consider the credibility of the witnesses; and it must view the evidence in a light most favorable to the prosecution and determine questions of law as to whether there is substantial evidence, direct or circumstantial, or both, which, with the reasonable inferences that may be drawn therefrom, will sustain the verdict."

Using those standards, the jury could have readily concluded that appellants were guilty of the crimes with which they were charged.

This trial consumed eight long hard days. The trial judge was faced with dozens of difficult and novel legal problems. It was not a perfect trial, but litigants are not entitled to, nor should they expect perfect trials. The trial judge conducted the trial in a commendable manner, and the appellants received a fair trial.

Affirmed.