Jonathan Lee **RODERICK**,
Appellant (Defendant),

v.

The **STATE of Wyoming**,
Appellee (Plaintiff).

No. 92-35.

Supreme Court of Wyoming.

Aug. 16, 1993.

Rehearing Denied Sept. 16, 1993.

Leonard D. Munker, State Public Defender; Michael Cornia, Sr. Asst. Public Defender; and Deborah Cornia, Asst. Public Defender, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., and Barbara Boyer, Sr. Asst. Atty. Gen., for appellee.

Before MACY, C.J., and THOMAS, CARDINE, and GOLDEN, JJ.; and BROWN, Retired J.

BROWN, Justice (Retired).

This appeal is from the judgment and sentence of the Eighth Judicial District Court entered on January 2, 1992, convicting appellant, Jonathan Lee Roderick, of felony murder, aggravated burglary and unauthorized use of a vehicle.

The issues are:

I. Whether appellant was provided a speedy trial?

II. Whether the State disclosed all constitutionally material exculpatory evidence?

III. Whether the trial court properly declined to suppress appellant's inculpatory statements?

IV. Whether the prosecutor was innocent of any misconduct?

V. Whether an opinion of appellant's guilt was offered at trial?

VI. Whether photographs of appellant's victim were properly admitted?

VII. Do consecutive sentences imposed for felony murder and the underlying felony merge for purposes of punishment?

We affirm.

Appellant Jonathan Roderick, age 15, was convicted of murdering Calvin Dillon, age 85, who resided in the vicinity of Glenrock, Wyoming. Roderick was no stranger to criminal activity, having been in the juvenile justice system since age 11.

On the evening of March 1, 1991, Roderick armed himself with a semi-automatic pistol and went to the home of Mr. Dillon, intending to steal. While the theft was in progress, Roderick shot Mr. Dillon twice. He later dragged the body to Mr. Dillon's truck and eventually dumped it amongst the trash on abandoned rural property. Roderick then quit the scene of the dumping with the victim's truck.

It seems that the counsel of Mr. Justice Frankfurter in *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) is particularly appropriate in this case and sets the tone of our review.

In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

## I.

An information was filed May 7, 1991, and appellant was arraigned a week later. A trial that resulted in Roderick's conviction commenced November 4, 1991, some 181 days after filing of the information.

Rule 204(b) Uniform Rules for the District Courts provides for a trial within 120 days after filing the information or indictment. This rule is advisory only. *Phillips v. State,* 774 P.2d 118, 122 (Wyo. 1989); *Phillips v. State,* 835 P.2d 1062, 1069 (Wyo.1992). Rather than set a mandatory time in which a trial is to be accomplished, courts consider multiple factors in determining the speedy trial question. In *Osborne v. State,* 806 P.2d 272, 277 (Wyo. 1991) (citations omitted), we said:

> Our speedy trial analysis is well established. We use the balancing test for evaluating speedy trial challenges that the United States Supreme Court formulated in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). This test requires us to look at: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of her right; and (4) the prejudice to the defendant. We consider all four factors together and balance them in relation to all relevant circumstances.

The speedy trial clock begins to run upon arrest or when the complaint is filed. *Id.*

Initially, charges were filed against Roderick in the juvenile court. After a hearing held April 23, 1991, the charges against Roderick were transferred to the district court. A criminal complaint was filed against the appellant April 29, 1991. On May 6, 1991, he waived a preliminary hearing and an information was filed and served May 7, 1991. His motion to consolidate charges was granted and Roderick was arraigned on May 15, 1991.

As would be expected in a case of this magnitude, numerous motions were filed by Roderick resulting in more than a few proceedings before the court. Among the motions filed by Roderick was a motion for discovery and inspection dated June 11, 1991. This motion was followed by a motion to suppress and motion to dismiss filed June 17, 1991. After the June 17 motions, other motions were made at regular intervals, including: amendment to motion to dismiss, another motion to dismiss, motion for reconsideration of motions to dismiss, several motions in limine, motion to compel attendance of a witness, motion to disqualify prosecuting attorney, motion to quash search warrant, and another motion to dismiss.

The first trial date was originally set for August 19, 1991, but was re-set for September 23, 1991. The trial was again postponed thirty days "to allow the Defense an opportunity to investigate the material they have received in discovery." The October 22, 1991 trial resulted in a mistrial.[1]

The progress of this case through the judicial system from filing the information to trial was 181 days. More than half of this 181 days is attributable to appellant. We do not fault appellant for filing numerous motions. Certainly a first degree murder case with two other charges is more complex than a single count larceny case. The only thing that the prosecution may have done to delay trial is fail to fully comply with the first discovery order. This is an arguable matter, however. Not only were most delays attributable to appellant, but most likely he benefitted by those delays. The delays provided him with broader and more extensive discovery access to

---

1. The district judge gave his reasons for declaring a mistrial:

 I declared a mistrial last week for two reasons: Number one, I thought that the way the trial was going it was prejudicial to the defendant and it was so prejudicial that I thought I should remedy that matter and start over so that he could have a fair trial in this matter.

 And the second reason was that I'm still somewhat convinced that maybe some of the remarks made by the jury panel might have tainted the jury panel we had seated. Despite their statements to—each of them to all of us, that they had not overheard the remarks, I was inclined to believe that a couple of them were sitting rather close to the lady and probably could have overheard them. That being the case, I thought we should start over and have a clean trial.

the State's files than he would otherwise have had. Although Roderick's trial was delayed, the reasons for the delay not attributable to him are mostly neutral. Appellant did not vigorously assert his right to a speedy trial, and although he had the benefit of counsel, he never pressed for an earlier setting. In fact, appellant did not show in writing, as contemplated by Rule 204(e) Uniform Rules of the District Courts, how a delay might prejudice his defense. He has shown no prejudice caused by the delay. These considerations lead us to conclude that appellant's right to a speedy trial was not violated.

## II.

■ Appellant contends in this issue that the state's failure to disclose exculpatory evidence deprived him of a fair trial. More specifically, he states that the tardy disclosures violated the *Brady* rule and deprived him of a speedy trial. The prosecution has the obligation to provide evidence in its possession that is both favorable to the accused and material to guilt or punishment. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, the Supreme Court held that the suppression of requested exculpatory evidence by the prosecution violates due process if the evidence is constitutionally material, either to guilt or to punishment.

On June 11, 1991, defense counsel made a motion specifically requesting certain materials and generally requesting all exculpatory evidence and evidence in the nature of impeachment. An order on this motion was never made; however, at the motion hearing, the prosecutor agreed to provide so-called *Brady* materials. Later, during a suppression hearing, defense counsel learned that certain materials had not been provided. It was his opinion that these missing materials were covered by the *Brady* rule and should be made available. The trial judge agreed and entered an order requiring the State to make available to the defense its entire investigative file.

In support of the exculpatory issue, appellant states in his brief:

He [appellant] was forced to give up his right to a speedy trial in order to receive the material. * * *

 * * * * * *

* * * [D]efense attorney had to reveal his entire case to the prosecution in order to obtain the clearly exculpatory evidence which was withheld. The chances of defense being successful at trial were substantially diminished by having to explain to the prosecutor how he would use the information which the court later deemed to be clearly exculpatory.

Specifically, appellant contends that: (1) The prosecutor had in his possession "[w]ritten statements from a witness, stating that Appellant's sister was present at the murder scene." (2) "The victim's sister gave a statement that the victim initiated a call to her in which he seemed very nervous and disturbed and then cut off the conversation." This was shortly before another witness saw Adam Saffle driving a vehicle similar to the victim's in an erratic manner in the vicinity where the victim's body was found. This same witness gave a statement that he believed the victim had been shot twice while he was in his kitchen. (3) The State Crime Laboratory inventory sheets were incomplete. (4) There were other suspects who were interviewed but not disclosed to the defense. One witness, a possible defendant, had moved. (5) The State failed to provide photographs of bullets recovered at the murder scene.

■ Appellant complains of the State's failure to disclose evidence indicating that his sister had once claimed to have been present at Calvin Dillon's murder. However, he fails to note that the State introduced his sister's official statements to the contrary at trial and that he attempted to keep her off of the stand by claiming she was a compulsive liar. Appellant totally ignores the fact that his sister's purported comments in no way absolved him from guilt. Appellant also claims the State should have disclosed evidence that Adam Saffle had been identified driving Calvin Dillon's truck near where the body was

eventually discovered and Saffle's alleged statement that Dillon was shot twice in his kitchen. Once again, appellant fails to demonstrate how such evidence absolves him.

 Appellant fails to explain how evidence that the victim's sister had a telephone conversation with her brother on the day of his murder which he abruptly cut short and during which he sounded nervous could be viewed as having a serious potential for changing the outcome of his trial, particularly in light of the fact that he fully explored that evidence at trial to no apparent effect. Appellant fails to show how the inventory sheets of the State Crime Lab were material to his case. In any event, the inventory sheets were made available to him well in advance of trial and were in no way exculpatory. Finally, appellant complains that the State failed to provide him with certain photographs of bullets recovered at the murder scene. Once again, he does not clearly specify which photographs form the basis of this complaint.

 Exculpatory evidence is material for purposes of the due process right to a fair trial only if there is a reasonable probability that it would favorably change the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); *California v. Trombetta*, 467 U.S. 479, 484, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984); *Engberg v. Meyer*, 820 P.2d 70, 77 (Wyo.1991); *Jones v. State*, 568 P.2d 837, 847 (Wyo. 1977) (same result under the Due Process Clauses of both the state and federal constitutions). *See also Pennsylvania v. Ritchie*, 480 U.S. 39, 52–53, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987).

 The failure to provide a defendant with evidence which is merely favorable or useful to him, but not likely to change the outcome of his trial, does not justify reversal under *Brady*. *Phillips*, 835 P.2d at 1074. Neither does the State have a duty to disclose evidence which is only speculatively helpful to a defendant or which merely exhibits a potential for lead-

ing to *Brady* material. *Gale v. State*, 792 P.2d 570, 588 (Wyo.1990). *See also Trombetta*, 467 U.S. at 487–89, 104 S.Ct. at 2533–34 and *Wilde v. State*, 706 P.2d 251, 255 (Wyo.1985). The defendant has the burden of proving that he was denied constitutionally material evidence and of providing evidence supporting such a claim. *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402; *Gale*, 792 P.2d at 582.

We cannot see anything in these so-called *Brady* materials that appellant could profitably use in his defense nor do we see anything that would help appellant to rebut the State's proofs. Most of the so-called *Brady* materials identified by appellant are questionable exculpatory materials. The others may be tangentially exculpatory. Appellant's argument with respect to *Brady* material is theoretical. He did receive all the material requested, albeit belated. He has totally failed to show how the evidence could have a serious potential for changing the outcome of the trial. The tardy disclosure of the so-called *Brady* material may have caused a thirty day delay in trial but, as indicated previously, appellant has not shown that this thirty day delay in any way prejudiced him.

### III.

In appellant's third issue, he contends that the court erred by failing to suppress inculpatory statements made by him in the course of five interviews. On March 20, 1991, Division of Criminal Investigation (DCI) agents interviewed five people whom they loosely described as "possible suspects." The site of the interview was the Rolling Hills Town Hall, a bi-level home converted for use as City Council Chambers for meetings and for the Converse County Sheriff's Department. Roderick was the fifth person interviewed. The interview was conducted in the City Council Chambers. Before the interview, Officer Van Buskirk went to appellant's place of residence and told his grandfather, Roderick's legal guardian, that DCI agents wanted to talk to Roderick. Van Buskirk asked the appellant and his grandfather if they would permit appellant to be questioned.

Both consented. Roderick's grandfather drove him to the site of the interview, but no request was made for the grandfather to be present during the questioning.

At the commencement of the interview, appellant was told by the officers that he was not under arrest, that he could choose not to speak to them, that he could leave at any time, and that he could have an attorney present during the interview if he so desired. The officers then requested permission of both appellant and his grandfather to take appellant's photograph and an exemplar of his finger and palm prints. Appellant expressed understanding of the officers' advice and once again both he and his grandfather consented to the interview, photographs and fingerprints. After one and one-half hours of questioning, appellant asked to leave. After allowing the officers to fingerprint and photograph him, he left.

The second interview was on March 25, 1991, in the City Council room with only DCI Agent Lynne Callaghan present. Apparently appellant initiated this interview, expressing, through his mother's boyfriend, his desire to provide additional information to the officers. Callaghan and Agent Gunn contacted Roderick's grandfather and asked that appellant be brought in. Before the interview, he was once again told that he was not under arrest, that he need not talk to the officers, and that he was free to leave whenever he desired. At the interview, appellant said that he had wanted to speak with investigators about Calvin Dillon's death and said that he had heard some names of people who he wanted to tell the investigators about. At this interview, Roderick denied ever being near the victim's truck. He then asked if he could terminate the interview when he so desired. Agent Callaghan invited Roderick to explain the presence of certain physical evidence at the scene of the crime. Appellant indicated that he had entered Dillon's house to steal, but that neither Dillon nor his truck were present at that time, and that he had been frightened off by Dillon's dog before taking anything. After a total of forty-five minutes, appellant asked to terminate the interview and left.

In connection with the two interviews on March 20 and March 25, the interviewing officers did not give Roderick a complete *Miranda* warning.[2] Their stated reason for this neglect was that they did not believe the interviews were custodial. Several hours after the second interview, Roderick was arrested for murder. After his arrest, appellant was interviewed several times. Before these latter interviews, he was given the traditional *Miranda* warning. At the first of these post-arrest interviews, Roderick was confronted with some non-existent physical evidence—a towel with blood on it, DNA residue and gun oil. During the post-arrest interviews, Roderick confessed to the killing of Calvin Dillon.

The facts and principles of law that are determinative of the third issue raised by Roderick are similar to the facts and principles involved in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Michael Elstad, age 18, was a burglary suspect. Officers Burke and McAllister went to the home of Elstad with a warrant for his arrest. Officer McAllister took Elstad's mother into the kitchen. Officer Burke remained with Elstad in the livingroom. Burke related his conversation with Elstad:

"I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and he also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was in-

---

**2.** Both appellant and the State refer to giving a suspect a *Miranda* warning as "Mirandizing," or, in another tense, as "Mirandized." These hideous terms were invented by bureaucrats. Were George Orwell alive, he would likely publish another addition of his book *"Nineteen Eighty–Four."* In that happy event, he surely would use "Mirandize" to illustrate the evolution of oldspeak to newspeak.

volved in that, and he looked at me and stated, "Yes, I was there." "

*Id.* at 301, 105 S.Ct. at 1288–89. After the Burke and Elstad colloquy, the latter was transported to the sheriff's headquarters and approximately one hour later Officers Burke and McAllister joined him in McAllister's office. Elstad was then, for the first time, advised of his *Miranda* rights. Subsequently Elstad confessed to the burglary.

At trial, the court excluded Elstad's inculpatory statement made before the *Miranda* warning, but admitted the confession made after the *Miranda* warning. The United States Supreme Court held that the trial court properly admitted the confession made after the *Miranda* warning and that the confession was not the "fruit of the poisonous tree."

In *Elstad*, the State conceded that the statement before the *Miranda* warning was custodial. In the case before us, the State has always contended that the statements before the warning were not custodial. In *Elstad*, the statement before the warning was excluded at trial. In the case here, the statement before the warning was part of the trial evidence. The interval of time between the unwarned statement and the statement after the warning in the case before us was significantly longer than in *Elstad*. Elstad contended, as does Roderick in the case before us, that his questioning before the *Miranda* warning tainted the subsequent confession as "fruit of the poisonous tree," citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■■■ Questioning by the police is subject to the *Miranda* rule only to the extent it is custodial in nature or the subject's freedom has otherwise been significantly restrained. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966); *Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293; *Beckwith v. United States*, 425 U.S. 341, 345–46, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). In determining whether statements made by an accused are voluntary, the totality of the circumstances must be examined. *Black v. State*,

820 P.2d 969, 971 (Wyo.1991); *Frias v. State*, 722 P.2d 135, 141 (Wyo.1986).

■■■ The record disclosed certain undisputed facts regarding Roderick's two interviews before the *Miranda* warning was given. On March 20, 1991: (1) Roderick's grandfather took him to the site of the interview. (2) Before the interview, appellant was advised by the officers that he was not under arrest; (3) that he did not have to speak to the officers; (4) that he could leave any time he desired; and (5) that he could have an attorney present. (6) Roderick and his grandfather gave permission to take appellant's photograph and an exemplar of his finger and palm prints. (7) Roderick did, in fact, discontinue the interview and leave the site when he desired. (8) The interview lasted an hour and a half. In the second interview of March 25, 1991, the scenario was almost identical to the first, except appellant initiated the latter interview and it only lasted forty-five minutes. Appellant makes no claim of coercion, threats, promises or deception. We have no problem determining, under a totality of the circumstances, that the two interviews of Roderick were non-custodial and that his statements were voluntary.

It has been held by this court that "even though fifth amendment and *Miranda* violations are not implicated here because Appellant was not in custody at the time of the interrogation as Appellant was told [appellant] was free to leave at any time, 'the due process clause still stands as [an] independent limitation on the use of a defendant's pretrial statement.'" *Black*, 820 P.2d at 971 (quoting 2 D. Rudstein, C. Erlinder, & D. Thomas, Criminal Constitutional Law § 4.01[1] at 4–5 (1990)).

■■■ As was done in *Black*, we review appellant's claim under Article 1, § 6 of the Wyoming Constitution: "No person shall be deprived of life, liberty or property without due process of law." In *Black* at 972, we said:

There is a line which the police may not cross in pursuing their investigation of a crime. That line is drawn by the due process clause of the Wyoming Con-

stitution. We are free to grant more rights to our citizens under the Wyoming Constitution than they are entitled to have under the United States Constitution. *See Washakie County School District Number One v. Herschler*, 606 P.2d 310 (Wyo.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).

In *Black* and *Frias*, we determined that the interrogation of the accused violated the due process clause of the Wyoming Constitution. The court determined in *Black* that there was police coercion. In *Frias*, we determined that there was coercion, threats, accusations, and the accused's knowledge and use of English was limited. The factors that prompted the court to find a violation of the accused's due process rights in *Black* and *Frias* are totally absent in the case before us. In the case here, voluntariness appears on the face of the record with unmistakable clarity. We are not aware of any coercion, threats, or promises in any of appellant's interviews, nor does he claim any. We do not believe that there is any significance to confronting Roderick with non-existent physical evidence. It is not suggested that this influenced appellant in any way. We therefore determine that Roderick's due process rights were not violated.

### IV.

In Roderick's fourth assignment of error, he charges the prosecuting attorney with misconduct so "reprehensible" that a reversal is mandated. In describing the prosecutor's conduct, appellant is given to some hyperbole.

Roderick delineates four general areas of alleged misconduct: (1) failure to disclose exculpatory evidence; (2) complicity with the police in failure to give appellant a *Miranda* warning; (3) violation of the trial court's discovery orders; and (4) attempting to influence a defense witness.

In part II of this opinion, we discussed failure to disclose exculpatory evidence and the court's discovery orders. In part III, we discussed the *Miranda* warning issue. Because of what we have said before, we will say very little about the first three areas of appellant's complaint regarding prosecutorial misconduct.

In describing the prosecutor's misconduct, appellant speaks in generalities and in his commentary makes an emotional appeal. Even now, after appellant having had free access to the State's files and the benefit of a trial, he has difficulty identifying exculpatory evidence that was not given him or was late in being given. Appellant contends that, because of the State's violation of the discovery rule, he had to reveal his entire case to the prosecution. He leaves us dangling as to what he had to reveal or why the State's action resulted in such revelation. Appellant must remember that discovery is not entirely a one-way street. The State has limited discovery under Wyoming Rules of Criminal Procedure, Rule 18(d). Appellant equates resistance to his motions by the State to bad faith, implying that the State has no right to test the validity of his motions.

Roderick brings to our attention Canon 5 (superceded) of the American Bar Association's *Canon of Professional Ethics*,[3] to this effect:

> The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible.

Appellant reads more into this canon than is justified. This canon does not contemplate that the prosecutor roll over and, without a whimper, acquiesce in every demand of defense counsel. The prosecutor also has a duty to the State to see that justice is accomplished.

We pointed out earlier in this opinion that, arguably, the prosecutor was tardy in disclosing to Roderick what he thinks was exculpatory evidence. Most of what was

---

**3.** The modern equivalents of Canon 5 cited by appellant appear to be Rule 3.8 of the ABA Model Rules of Professional Conduct and Ethical Consideration (EC) 7–13 of the ABA Code of Professional Responsibility.

eventually disclosed was irrelevant or otherwise inadmissible and we are hard pressed to see how its disclosure at an earlier date could have helped appellant's case. At best, appellant's complaint regarding tardy disclosure and speedy trial are technical objections and he has made only a feeble effort to show any prejudice.

Appellant charges the prosecutor with complicity with the police in failing to give him a *Miranda* warning before the pretrial interviews. The record does not support this indictment. Roderick attempts to read some sinister motive in the prosecutor's telephone conversations with the police on or about the time of the first two interviews. The prosecutor may have been remiss in his duties as chief law enforcement officer of the county if he ignored an investigation of the magnitude of first degree murder. We cannot fault the prosecutor for his interest in the investigation. The record does reveal that, in a telephone conversation about the time of one of the pre-arrest interviews, the prosecuting attorney told investigator Gunn that it would be best to give Roderick a *Miranda* warning. The record further reveals that investigator Gunn made the decision not to give the warning because, in his opinion, Roderick was not in custody.

Appellant charges the prosecutor with attempting to influence one of the defense witnesses. Colleen Siebken, the victim's sister, telephoned the prosecuting attorney. The prosecuting attorney told Mrs. Siebken that she had been subpoenaed by the defense and that she should call the public defender's office. At another time he again told her to call the public defender's office. During the conversation Mrs. Siebken said she felt that other people were involved in the murder of her brother. Evidence produced at trial regarding the dialogue between Mrs. Siebken and the prosecutor, consisting of about two transcript pages, is rather confusing and inconclusive.

The clearest account of what happened is the following colloquy:

Q. And during that period of time you told me that you would stand up in court and say certain things about people that you knew other people were involved in, things such as that or at least you felt that you did?

A. Right.

Q. And didn't I tell you if you did that, you might cause a mistrial and to first of all, talk to defense counsel about it or words—tell you to talk to Mr. Kissinger about that?

A. You told me that. I don't know, you know, you told me that if it was brought out there were other boys, there was never anything brought forward, that the jury wouldn't believe that it would be—what do you call it—reasonable doubt.

Throughout this brief conversation, the prosecutor maintained that her proposed testimony might cause a mistrial. Mrs. Siebken equivocated but said she thought the prosecutor said her testimony might cause reasonable doubt. During this conversation, the prosecutor also expressed a fear that, if Mrs. Siebken stated that she thought Roderick ought to be executed, a mistrial might result.

The feelings of Mrs. Siebken were irrelevant and technically inadmissible. However, her feelings were brought out at trial by the defense. We cannot see how the prosecutor influenced this defense witness in any way. She freely testified at trial about her feelings earlier expressed to the prosecutor. We see no chilling effect resulting from the prosecutor's telephone conversation. If some self-styled constitutional lawyer can see some potential for chilling effect, we then say the testimony was immaterial, harmless, and no prejudice is even suggested. *Stogner v. State*, 674 P.2d 1298, 1301–02 (Wyo.1984). Hindsight may suggest that the prosecuting attorney should have told Mrs. Siebken that he could not talk to her and hung up. Wyoming prosecutors are more courteous than that. Hindsight might also suggest that the prosecuting attorney advise the investigators to give Roderick the *Miranda* warning at the first interview, thus avoiding the in-or-out

of custody problem. The prosecuting attorney arguably should have "coughed up" his file at an earlier date. However, we have found no reversible error in these several neglects.

## V.

In this assignment of error, appellant contends that: "The testimony by Agent Callaghan that Appellant killed Mr. Dillon invaded the province of the jury by commenting on the ultimate issue of guilt." During the testimony of Agent Callaghan, the investigating officer called by the State, the following exchange took place:

Q. [By the State]: Did you later have an—I think you already testified that you also—you interviewed him [the appellant] at approximately 2:40?

A. That's right.

Q. And where did that interview take place?

A. That interview took place in the same interview room that he had been talking prior to that.

Q. And what did you do prior to that interview?

A. I had learned some information with regard to how Calvin Dillon really was killed by John Roderick and I wanted to ask John about it.

MR. KISSINGER: Objection, Your Honor, to the comment, "by John Roderick," and move to strike, also.

MR. BURLEY: Well, Your Honor—

THE COURT: Sustained. Is that the hearsay objection, Counsel?

MR. KISSINGER: Your Honor, she stated—the witness stated where—as not being a statement or admission by him, but stated, "Where Mr. Dillon was killed by John Roderick."

THE COURT: Sustained, order it stricken and the jury is ordered to disregard the statement. Go ahead, Counsel.

█ Appellant directs our attention specifically to one of Agent Callaghan's answers to this effect: "I had learned some information with regard to how Calvin Dillon really was killed by John Roderick and I wanted to ask John about it." Appellant contends that Callaghan was testifying to hearsay. In his brief, he also says:

By testifying in this manner, Agent Callaghan was able to vouch for the truthfulness of another witness and intruded on the province of the jury by testifying on the ultimate issue of guilt or innocence. As this Court has made clear in its recent decisions, a witness may not vouch for the truthfulness of another witness and may not articulate an opinion as to the guilt of the accused.

Agent Callaghan's testimony in substance is tantamount to an assertion that she believed John Roderick had killed Mr. Dillon. This assertion of Appellant's guilt invaded the province of the jury in their role as the determinators of the ultimate issue of guilt or innocence. (Citations omitted.)

We note that Agent Callaghan's answer is totally unresponsive to the question asked. There is no suggestion that the prosecuting attorney solicited or expected such an answer. Callaghan improperly answered the question. However, the prosecuting attorney did not try to exploit Callaghan's answer in further questioning, nor in summation.

It should be noted that the trial judge ordered the jury to disregard Callaghan's unresponsive statement. We must assume, absent an indication to the contrary, that the jury followed the court's instructions and orders. Were this not so, the jury system would be suspect. We do not impute bad motives to Callaghan and there is no reason to believe that she surreptitiously answered the question in an effort to produce testimony that was otherwise inadmissible. We do not believe the agent was vouching for the truthfulness of another witness, nor was she expressing an opinion as to the guilt of Roderick.

In reading the cold, printed record in isolation, it would not be totally unreasonable to arrive at a different assessment of the testimony. Were another court searching for reversible error, it might jump on this isolated part of the record and view the

answer in the manner contended by Roderick. Searching for a way to reverse a case is contrary to appellate rules and, in any event, is not our wont. Roderick's confession that he killed Mr. Dillon was before the jury and in the record before the answer in question. Callaghan's answer was merely stating in another or abbreviated way what the jury had previously learned. It appears that what she said may have been a preface to answering the question asked.

In his various confessions, Roderick had told slightly different stories about the shooting of Mr. Dillon. One story was that Mr. Dillon grabbed Roderick's shoulder and spun him around and that Roderick then shot the deceased twice. Another account was that Roderick shot Mr. Dillon, who then fell to the floor, face down. Roderick then rolled Mr. Dillon over to see if he was dead. According to Roderick, Dillon's throat was still moving so he knew Dillon was not dead. Roderick then backed up and shot him again to make sure he was dead.

In the course of the investigation and questioning of Roderick, he had hinted that there were others involved or at least present at the time of the killing. Also, throughout the investigation, there were rumors and speculation that others were involved in the killing or at least knew something about it. Even the names of some of Roderick's close relatives were mentioned. It appears that Agent Callaghan's reason for repeated questioning of Roderick was to determine if others were involved in the murder of Mr. Dillon and to resolve Roderick's conflicting stories.

In considering the agent's unfortunate answer in context with her total testimony and other evidence, we determine that, if there was an error, it was harmless. W.R.Cr.P. 52(a) provides: "Harmless error—any error, defect or irregularity or variance which does not affect substantial rights shall be disregarded." The concept of harmless error was explained in *Jones v. State*, 735 P.2d 699, 703 (Wyo.1987):

An error must be "injurious or prejudicial" to warrant reversal, and it is the burden of the party appealing to establish the injurious or prejudicial nature of the error. *Spilman v. State*, Wyo., 633 P.2d 183 (1981). We have said with respect to Rule 49(a), W.R.Cr.P., which is the source of Rule 7.04, W.R.A.P., that:

"* * * For an error to be regarded as harmful, there must be a reasonable possibility that in the absence of the error, the verdict might have been more favorable to the defendant." *Hoskins v. State*, Wyo., 552 P.2d 342, 351, *reh. denied* 553 P.2d 1390 (1976), *cert. denied* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977).

Admission of improper evidence does not mandate reversal of a conviction in all instances. *United States v. Corey*, 566 F.2d 429, 432 (2d Cir.1977).

Because of the abundance of inculpatory evidence against Roderick, including but not limited to the several confessions and physical evidence, we hold that there is not a reasonable possibility that the verdict would have been different absent Callaghan's answer. In its totality, the other evidence was overwhelming in showing that Roderick killed Mr. Dillon.

In summary, we hold that the Callaghan statement, if it was error, was harmless beyond a reasonable doubt. It is inconceivable that the jury, listening to testimony consisting of nearly 800 pages of transcript, would be influenced by a casual, unresponsive statement of Callaghan.

## VI.

This issue concerns the propriety of admitting into evidence photographs of the victim's body. State's Exhibit 2 is a photograph of the victim's body at the scene where it was dumped. Exhibit 3 shows the body on the autopsy table, fully clothed. Exhibit 31 shows a portion of the deceased's face and Exhibit 32 focuses on the deceased's neck.[4] These photographs

---

**4.** It is questionable if appellant made a proper objection to the admission of Exhibits 2 and 3.

The record shows that, although appellant reminded the trial court of his continuing objec-

are not gruesome, gory or grotesque; nor are they designed to inflame the jury. This is especially true when compared to an exhibit in *Shaffer v. State*, 640 P.2d 88 (Wyo.1982) where a photograph of a 21 month old victim, characterized by the court as an "unrecognizable lump of charred flesh" was in evidence. *See also Key v. State*, 616 P.2d 774 (Wyo.1980) (the court characterizing as "slight" the prejudicial effect of several photographs of the victim's body showing seven stab wounds and incisions incurred in emergency surgery).

In *Shaffer*, 640 P.2d at 98, we said:

When a party objects to admission because the photograph is unduly prejudicial under Rule 403, W.R.E., the judge must weigh the probative value of the photograph against its possible prejudicial effect.[5] * * *

* * * Absent a clear abuse of discretion, we will not upset the trial judge's ruling on the admission of a photograph. *State v. Lindsay*, 77 Wyo. 410, 317 P.2d 506 (1957). Further, the other evidence here was sufficient to support the jury's finding of the Shaffers' guilt, and questionable evidence which in a more doubtful case might be grounds for a new trial, may be disregarded as not prejudicial. *Reeder v. State*, [515 P.2d 969 (Wyo.1973)] supra; *Espy v. State*, 54 Wyo. 291, 92 P.2d 549 (1939).

Hindsight suggests that it was likely unnecessary to use State's Exhibits 2, 3, 31 and 32. However, prosecutors believe that usually it is more effective to illustrate how death occurred from reference to photographs of the deceased rather than reference to anatomical drawings or charts.

Likewise, it is more effective and clearer if photographs of wounds are exhibited rather than to hear a description of the wounds or other matter without reference to photographs. Arguably, the photographs in question had little or no relevance; however, they were not without some probative value. State's Exhibit 2 was initially used to obtain an identification from the victim's son of the body discovered by police. Its relevance, in part, was to establish the accuracy and veracity of appellant's confession by showing the facial injuries suffered by the victim when dragged down his trailer steps and by confirming appellant's description of the scene where he dumped the body. Exhibit 3 was initially used during an officer's testimony to establish a chain of custody; that is, to show that the body identified from the "dumping scene" as being Dillon's was the same body being autopsied. The relevance of Exhibits 31 and 32 was to counter the attempts of appellant's counsel to discredit the accuracy of Roderick's confession by suggesting that the trajectory of the lethal bullets through Dillon's body was inconsistent with Roderick's account of the killing. Counsel questioned the pathologist who performed the autopsy, Dr. Patrick Allen, about the location of any entry and exit wounds and about the possibility of extrapolating from those facts the relative positions of Dillon and his killer.

We have no problem holding that the trial court did not abuse its discretion in determining that the photographs were relevant and not unduly prejudicial under W.R.E. 403.

### VII.

█ The final issue raised by appellant concerns consecutive sentences for felony

---

tion to evidence derived from his allegedly unlawful confession, he did not specifically object to either of these exhibits on any ground. It is a dangerous practice to rely on a continuing objection indefinitely. In any case, a continuing objection has run its course when another area of evidence is involved, as in this case.

Exhibits 31 and 32 suffer a further infirmity with respect to an admission error. There is no indication in the record that they were ever admitted into evidence. These exhibits, however, were included in the record on appeal. Furthermore, the prosecuting attorney, in summa-

tion, without indicating the number of the exhibits, told the jury what these photographs showed.

5. W.R.E. 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste or time, or needless presentation of cumulative evidence.

murder and the underlying felony of aggravated burglary.

Roderick was convicted of felony murder, aggravated burglary, and unauthorized use of a vehicle. He received a life sentence for felony murder, a term of 15 to 25 years for the underlying felony of aggravated burglary, and one year for the unauthorized use of a vehicle. The court imposed the 15–25 year term to run consecutive with the life term.

Sentence in this case was imposed January 2, 1992. At the date of sentencing, *Birr v. State*, 744 P.2d 1117 (Wyo.1987) stated the status of the law with respect to the situation before the trial judge. *Birr* held that multiple punishments for the felony murder and the underlying felony were legislatively authorized. In imposing sentence in the case before us, the trial judge acted in conformity with *Birr*.

After the sentencing in this case, the Wyoming Supreme Court in *Cook* and *Peterson v. State*, 841 P.2d 1345 (Wyo.1992) overruled *Birr*. *Castle v. State*, 842 P.2d 1060 (Wyo.1992), reaffirmed *Cook* and *Peterson*. The status of the law in Wyoming now is that multiple punishments for felony murder and the underlying felony are impermissible and such a sentence is error.

*Stare decisis* mandates that we vacate that portion of the trial court's sentence imposing a term of 15 to 25 years for aggravated burglary.

We note, in closing, that this was not a perfect investigation nor a perfect trial. Perfection is only achieved in the halls of academia, but in real life one does not see it. The investigators and prosecutor walked near the edge throughout this entire matter, but avoided going over the brink. After reviewing the entire record, we believe that Roderick received a fair trial and was ably represented at trial and on appeal. Appellant must have known from the beginning that his best shot at walking away from his crime was some technical error in the investigation or trial.

No one has ever said that Roderick did not kill Mr. Dillon.

We end with where we began by paraphrasing Mr. Justice Frankfurter in *Johnson v. United States*, 318 U.S. 189, 63 S.Ct. 549: We have relived this trial from beginning to end and have not seized upon isolated abstract questions of evidence and procedure, but rather have carefully considered the totality of the circumstances. It has not been our wont to turn this appeal into a quest for error and thereby try to demonstrate superior erudition and omniscience.

Affirmed in all respects except as to judgment and sentence, which we modify by vacating the 15 to 25 year term for aggravated burglary. This matter is remanded to the district court to enter an amended judgment and sentence consistent with this opinion.

BROWN, Justice (Retired), specially concurring in Part VII, with whom MACY, C.J., joins.

I believe that the holding in *Birr v. State*, 744 P.2d 1117 (Wyo.1987), to the effect that multiple punishments are permissible, best reflects the intent of the legislature and the will of the citizens of Wyoming and is not constitutionally infirm. If the issue of multiple punishments were important, I would vote to reinstate the law set out in *Birr*.[1] Under the circumstances of this case, *stare decisis* seems to me to be a more compelling principle.

We do a disservice to Wyoming citizens, the trial bench, and lawyers if we switch back and forth and the law changes depending on the composition of the court. Were I to vote to reinstate *Birr*, a court with a slightly different composition next month or next year would likely again overrule *Birr*. I found myself in an identical position several years ago. In *Clenin v. State*, 573 P.2d 844, 846 (Wyo.1978), the Wyoming Supreme Court adopted a rule that "any comment upon an accused's exercise of his right of silence, * * * is prejudi-

---

**1.** It seems that multiple punishments under the circumstances of this case are not very important. On the face of it, nothing is gained by adding 15 to 25 years to a life sentence. Of course, it may have some significance when the appellant appears before the Board of Parole.

cial, and will entitle an accused to reversal." By 1982, the composition of the Wyoming Supreme Court had changed, and in *Richter v. State*, 642 P.2d 1269, 1274 (Wyo. 1982), *Clenin* was overruled and a majority of the court held that the prosecutor's improper comment on defendant's exercise of his right to remain silent was not prejudicial per se, but may be found to be harmless error. The composition of the court changed again, and in 1984 along came *Westmark v. State*, 693 P.2d 220, 222 (Wyo.1984). In that case, three members of the court seized upon *Westmark* to overrule *Richter* and reestablish the rule of *Clenin*. By 1986, the composition of the court again changed. A majority of the court could now overrule *Westmark* and reestablish the rule in *Richter*. In *Summers v. State*, 725 P.2d 1033, 1048 (Wyo. 1986), I declined to join a potential majority to overrule *Westmark*, although I always favored the rule that a comment on an accused's exercise of his right of silence is not prejudicial per se. In *Summers*, my vote was influenced by the principle of *stare decisis*.[2]

If *stare decisis* means anything in Wyoming, I must follow the law set out in *Cook, Peterson*, and *Castle*, and not vote to reinstate *Birr*. In my view, *stare decisis* under the circumstances of this case is the more important principle.

THOMAS, Justice, specially concurring.

I am in complete accord with the resolution of the issues in this case according to the majority opinion, with two exceptions. First, I have never believed that *Black v. State*, 820 P.2d 969 (Wyo.1991), stood for any legal proposition. It simply serves to demonstrate that, from time to time, this Court is compelled to manage some local police department.

Second, I hope that my views in *Castle v. State*, 842 P.2d 1060 (Wyo.1992), and *Cook v. State* and *Peterson v. State*, 841 P.2d 1345 (Wyo.1992), are adequately set forth in my dissenting opinions. I once puckish-

ly remarked that the doctrine of *stare decisis* should prevail in Wyoming, at least for six months. Upon reflection, I recognize that I was impulsive, and I now am satisfied that the doctrine should apply for a full year. Since we are still within that year, we should not overrule *Cook, Peterson*, and *Castle* at this time. When that is done, it is best that it be accomplished by a majority of the regularly appointed or elected members of the Court.

---

**2.** In *Summers*, the majority avoided the harsh rule in *Westmark* by simply declaring that there

was no comment on silence.