Kenneth C. RELISH, Appellant
(Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 92–185.

Supreme Court of Wyoming.

Sept. 24, 1993.

Tony S. Lopez argued, of Zimmers & Lopez, Laramie, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., and Barbara L. Boyer, Sr. Asst. Atty. Gen., argued, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

CARDINE, Justice.

Kenneth Relish was convicted of aggravated homicide by vehicle for the death of Thomas Neal under W.S. 6-2-106(b)(ii) (Cum.Supp.1993) [1]. After trial, Relish filed a motion for a new trial alleging that the prosecution failed to disclose exculpatory evidence. Relish's motion for a new trial was denied, and judgment and sentence were entered. Relish appeals claiming that undisclosed, exculpatory evidence required grant of a new trial; that the district court erred in denying him an instruction concerning Neal's death certificate; and that insufficient evidence existed to support the jury's verdict.

We affirm.

Relish describes the issues as follows:

ISSUE I: Whether defendant's rights to a fair trial were denied by non-disclosure of material evidence by the State of Wyoming?

ISSUE II: Did the Court err in refusing the defense's request and instruction based on *Alcala v. State*, 487 P.2d 48 [448] (Wyo., 1971)?

ISSUE III: Was the evidence presented sufficient to convict?

## FACTS

In the late evening and early morning hours of November 4 and 5, 1991, an early season winter storm blanketed the high plains of southeastern Wyoming. As occurs frequently, the elements of a winter storm—strong winds, blowing snow, frigid temperatures, and ice—created treacherous driving conditions on Interstate 80 (I-80) in southeastern Wyoming. Visibility was very poor, and at times whiteout conditions reduced visibility to near zero.

I-80 crosses, east to west and west to east, the full length of the southern tier of Wyoming. One particular stretch of fifty miles between Laramie and Cheyenne, Wyoming commences from Laramie, at an altitude of 7,200 feet, climbs east up Sherman Hill to almost 9,000 feet, and then gradually descends into Cheyenne, to an altitude of 6,100 feet. On the night of November 4, 1991, approximately seventeen miles east of Laramie, just past Sherman Hill where I-80 sits on a high plateau, unprotected from notoriously high winds, the driving conditions worsened. According to one eyewitness, "the road * * * was either snow or packed ice * * *[,]" it was a "whiteout[,] * * * we could not even see the reflectors on the side of the road."

Two very different vehicles were travelling that section of I-80 in the late evening and early morning of November 4 and 5, 1991. The first was a blue compact sedan carrying four young adults, Amy Detgen (Detgen), Scott Soble (Soble), George Ballard (Ballard) and Tom Neal (Neal). The second was an eighty thousand pound eighteen wheel semi-truck (semi) driven by appellant, Ken Relish (Relish).

\* \* \* \* \* \*

(ii) He operates or drives a vehicle in a reckless manner, and his conduct is the proximate cause of the death of another person.

---

1. W.S. 6-2-106(b)(ii) provides:

(b) A person is guilty of aggravated homicide by vehicle and shall be punished by imprisonment in the penitentiary for not more than twenty (20) years, if:

The sedan and its four occupants had stopped in Laramie at around 11:00 p.m. on November 4, 1991, before continuing east on I–80 towards Cheyenne at approximately 11:30 p.m. When the sedan departed Laramie, Soble was driving; Ballard occupied the front passenger seat; Detgen sat in the rear passenger seat behind Ballard; and Neal sat in the rear seat directly behind the driver Soble. As they travelled along I–80, the road conditions sharply deteriorated forcing Soble to reduce his speed, from near normal just outside of Laramie to ten or fifteen miles per hour as they approached mile marker 334, seventeen miles east of Laramie. Because of the conditions, Soble turned on the sedan's hazard lights and then pulled off the interstate. This initial stop was brief, however, because they believed the spot to be too precarious due to oncoming traffic. After continuing another half mile, the sedan slid off the interstate. Soble, Ballard, Detgen, and Neal decided that continuing was too dangerous, and thus Soble powered the sedan completely off the highway and shoulder so that the sedan sat approximately ten to fifteen feet off of the paved shoulder. At this time, Soble turned the car off leaving the hazard lights on, and all but Soble settled in to rest.

At approximately the same general time, Relish, after a ten-hour layover in Laramie, continued his journey along I–80 and headed east towards Cheyenne. Relish, a truck driver for forty years, was hauling a load of vegetables back to his home state of Wisconsin. After cresting the top of Sherman Hill, ten or so miles outside of Laramie, Relish stated he was travelling at fifty to fifty-five miles per hour in blowing snow, on a snow covered highway. Several miles beyond Sherman Hill, Relish claims the weather deteriorated significantly, and between mile markers 334 and 335 he felt a bump as if "something or someone hit me, or I ran over a stone or something."

Meanwhile, the four companions in the sedan had been parked off the interstate for about five minutes, just beyond mile marker 334. Then, as Detgen describes it, "I heard a very loud roaring noise, and I was, we were getting pushed forward, we were flying forward across the snow." After this impact, Detgen, Soble, and Ballard managed to extricate themselves from the badly damaged sedan. Immediately after exiting the sedan Detgen screamed to Soble, "What hit us, what happened?" Soble replied, "[i]t was a truck, he came flying by, he hit us, it was a truck." Neal remained in the sedan, the portion of the car where he sat had suffered the brunt of the impact and was crushed beyond recognition. Soble managed to flag down another truck driver as it approached the accident scene. Soble, Ballard and Detgen climbed into the truck for warmth while the trucker radioed local law enforcement for assistance. Neal, however, remained trapped within the badly damaged sedan.

Deputy Chris Lundval (Deputy Lundval) of the Laramie County Sheriff's Department was first on the scene, arriving at around 12:50 a.m. on November 5. Deputy Lundval immediately checked Neal for vital signs and determined that he had died. Later, the Albany County Coroner determined that Neal had died from a cerebral hemorrhage caused by a skull fracture. Soble and Ballard informed Deputy Lundval that they had been hit by a "semi truck." Wyoming Highway Patrolman Jeffrey Baltimore (Patrolman Baltimore) arrived soon after Deputy Lundval. Patrolman Baltimore remained on the scene, while Deputy Lundval drove east on I–80 in search of the semi.

Approximately one mile down the interstate, Deputy Lundval came upon a disabled semi parked on the side of the highway. Deputy Lundval discovered that the semi's owner and operator was Relish. Deputy Lundval noted extensive damage to one of the rear axles on the passenger side of the trailer and asked Relish whether he was in an accident. Relish explained to Deputy Lundval that, "I hit something while in a whiteout." After learning that Relish had radioed for a wrecker for his truck, Deputy Lundval asked Relish to remain with his truck until the Highway Patrol arrived to take a more detailed statement.

Patrolman Baltimore finished investigating the accident scene, then drove down the interstate to question Relish. Patrolman Baltimore observed that Relish was "pretty anxious to take his load to Wisconsin" and that he "never said much about the accident itself." In addition, a second highway patrolman, Mike Johnson (Patrolman Johnson), talked to Relish soon after the collision and noted that he was "uncaring, pretty laid back, not very concerned," despite knowing another vehicle was involved. Later that morning, after having temporary repairs completed on his trailer while still on the side of I–80, Relish drove his semi back to Laramie for more permanent repairs.

Based upon inspections of the accident scene and the two vehicles, Patrolman Baltimore was able to testify that Relish's semi veered completely off the interstate, colliding with or running over the blue sedan as it sat parked ten to fifteen feet off the paved shoulder of the road. The semi then "veered back up to the interstate * * * almost getting back on the road, the [semi] went back down toward the slope a little bit, and then veered back up to the interstate" and continued down the highway until the semi became disabled. Patrolman Baltimore then testified that: (1) twenty-five miles per hour was a reasonably safe speed in the conditions as they existed that evening and morning; (2) Relish was travelling at sixty to sixty-five miles per hour at the time of the accident; and (3) sixty to sixty-five miles per hour was too fast in those conditions.

After his semi was repaired in Laramie, Relish continued on his trip to Wisconsin. On November 21, 1991, a criminal complaint was filed charging Relish with aggravated homicide by vehicle, and on February 8, 1992, he was arrested. On May 6, 1992, after a three-day trial, Relish was convicted of aggravated homicide by vehicle. On June 5, 1992, Relish filed a motion for a new trial, arguing that the prosecutor had withheld exculpatory evidence. On July 20, 1992, the district court denied Relish's motion for a new trial. Judgment and sentence were entered on August 18, 1992.

Relish appeals from the judgment and the denial of his motion for a new trial.

## DISCUSSION

### I. Motion For New Trial

Relish asserts first that he was denied a fair trial because the prosecution failed to disclose two allegedly exculpatory witnesses. The argument is the same as that presented by Relish to the trial court in his motion for a new trial.

The standard of review to which this court adheres when reviewing a denial of a motion for a new trial is as follows:

[A] motion for a new trial is within the sound discretion of the trial court and this court will not reverse unless the appellant affirmatively demonstrates an abuse of discretion.

*Warren v. State*, 809 P.2d 788, 790 (Wyo. 1991); *see also Barnes v. State*, 858 P.2d 522, 536 (Wyo.1993).

■ In Relish's brief to this court and in his motion for a new trial he argued that his trial was unfair because the prosecution failed to disclose exculpatory evidence. He cites a line of federal cases centered around *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The landmark *Brady* decision requires prosecutors to disclose evidence "that is both favorable to the accused and material to guilt or punishment." *Roderick v. State*, 858 P.2d 538, 543 (Wyo., Aug. 16, 1993). In order to establish a *Brady* violation, Relish must prove: (1) suppression of evidence by the prosecution; (2) that · the evidence would have been favorable to him; and (3) that the evidence is material. *United States v. Wolf*, 839 F.2d 1387, 1391 (10th Cir.1988), *cert. denied* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988); *see also Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972).

■ It is important to note that the *Brady* rule is not a rule of discovery; instead, it is grounded in the United States Constitution's due process clauses and is intended to protect the criminal defendant's right to

a fair trial. *United States v. Agurs*, 427 U.S. 97, 107–114, 96 S.Ct. 2392, 2399–2402, 49 L.Ed.2d 342 (1976). The allegedly exculpatory evidence, on which Relish relies to support his claim for a new trial, consists of the proposed testimony of two witnesses who were interviewed by the prosecution but not presented at trial. The first witness is John Daily (Daily), an accident reconstruction expert, and the second is Amy Nagle (Nagle), an eyewitness to the weather conditions.

### A. Daily's Proposed Testimony

The first prong, which must be satisfied in order to establish a *Brady* violation, is nondisclosure or suppression by the prosecution. *Wolf*, 839 F.2d at 1391; *Moore*, 408 U.S. at 794–95, 92 S.Ct. at 2568. In *Moore*, the defendant appealed his conviction for murder claiming, in part, that he was denied a fair trial because the prosecution failed to disclose exculpatory statements made by prosecution witnesses to the prosecutor. *Moore*, 408 U.S. at 793–94, 92 S.Ct. at 2567. In holding that the *Brady* rule was not implicated, the *Moore* court said, "[w]e know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work." *Moore*, 408 U.S. at 795, 92 S.Ct at 2568. In this regard, we have said the prosecution "has no duty to manufacture evidence." *Wilde v. State*, 706 P.2d 251, 255 (Wyo.1985).

■ The Second Circuit Court of Appeals has developed a standard for determining whether evidence has been suppressed for purposes of the *Brady* rule. It stated:

> Evidence is not "suppressed" if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence. [citations omitted]

*United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Applying this standard to the facts of this case leads to the conclusion that the prosecution did not suppress Daily for *Brady* purposes.

The prosecutor disclosed Daily to Relish as a potential prosecution witness in a pretrial document titled *Memorandum of Matters Agreed Upon*. The prosecution's disclosure of Daily, by including his name on the stipulated witness list, was sufficient to meet any duty the prosecutor may have had under *Brady*. The witness list revealed to Relish that Daily was a potential government witness which should have alerted Relish that Daily might have relevant information concerning the case.

This result is in accord with *Jackson v. Wainwright*, 390 F.2d 288 (5th Cir.1968), *United States v. Beasley*, 442 F.Supp. 1152 (E.D.La.1977) and *People v. DeStefano*, 30 Ill.App.3d 935, 332 N.E.2d 626 (1975), all of which suggest that a simple disclosure of a witness' identity is sufficient unless it is combined with a misrepresentation by the prosecutor. In *Jackson*, the Fifth Circuit held that the prosecution's disclosure of a witness who had exculpatory information by name and address only was insufficient because the prosecution affirmatively misled the defendant concerning the value of the witness' information. *Jackson*, 390 F.2d at 298.

In *Beasley*, following a conviction, the defendant filed a motion for a new trial arguing, in part, that the prosecutor was aware that certain witnesses' testimony would favor the defense and that the prosecutor had a duty to communicate that awareness to the defense. *Beasley*, 442 F.Supp. at 1157. That court rejected Beasley's contention, finding no duty for the prosecutor to disclose his own view of potential testimony and stating:

> The defense had every opportunity to call [the witnesses], their testimony was not concealed or misrepresented by the government, and the decision not to call them was a strategic and knowing one.

*Beasley*, 442 F.Supp. at 1157.

In *DeStefano*, an Illinois Appeals Court held that a defendant was denied a fair trial due to the prosecution's deliberate misrepresentation concerning a material witness. *DeStefano*, 332 N.E.2d at 631. In that case the prosecutor gave the defense a witness list which stated, "George

Leighton, address unknown," despite the fact that George Leighton was a Justice of the Illinois Appellate Court who had chambers in the same building as the prosecutor. *Id.*

Relish asserts in his brief that Daily's name was omitted from the State's witness list despite what the record reveals. However, at oral argument, Relish's counsel admitted that Daily's name was on the witness list and instead implied that the prosecutor had misled him after he inquired about Daily. This claim is apparently asserted for the first time on appeal.

■ We agree with the reasoning employed in *Jackson, Beasley* and *DeStefano,* that is, disclosure of the witness' name is sufficient to satisfy *Brady* and, in the absence of an affirmative misrepresentation concerning the witness or the testimony of the witness, will defeat a claim of concealment or suppression of evidence. Relish was provided with Daily's name before trial, and there is absolutely no evidence in the record to establish that the prosecution concealed or misrepresented the content of Daily's opinions. Therefore, we hold that the prosecutor did not suppress potentially material evidence concerning Daily.

The second and third prongs of the *Brady* rule require that the suppressed testimony be favorable to the defendant and that it be material. Having determined that the evidence was not suppressed by the prosecution, we need not explore or determine the effect of satisfying these prongs of *Brady* upon this case, and we decline to do so.

### B. Nagle's Proposed Testimony

■ Unlike the State's disclosure of Daily's identity, the State admits that it did not disclose Nagle's identity to Relish. Therefore, the second and third prongs of the *Brady* analysis must be explored.

In *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the United States Supreme Court refined the standard for determining when evidence, not disclosed by the prosecution, is suffi-

ciently material to amount to constitutional error by stating:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383; *see also Engberg v. Meyer,* 820 P.2d 70, 77 (Wyo.1991). In addition, the *Bagley* Court held that this standard applies regardless of whether the defense had made "no request," a "general request," or a "specific request" for exculpatory evidence. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383; *see also Bagley* 473 U.S. at 685, 105 S.Ct. at 3385 (Justice White concurring, with whom Chief Justice Burger and Justice Rehnquist concur as to the standard set by Justice Blackmun's lead opinion); *Engberg,* 820 P.2d at 77; *see also* Wright, *Federal Practice and Procedure, Criminal 2d* § 557.2 (1993 Pocket Part).

Nagle's affidavit offers little, if any, material evidence. Her affidavit states that she was travelling on I–80 sometime on November 5, 1991; that she saw what may have been the sedan off the road and what may have been Relish's semi parked on the side of the road; that she discussed these observations with the prosecutor on a couple of occasions; and that there were whiteout weather conditions near the scene.

Even if Nagle could positively identify the two vehicles she observed, as the sedan and the semi, and she could testify to the precise time she was travelling on November 5, 1991, her testimony would only be cumulative. Evidence which is "at best cumulative" does not meet the *Bagley* materiality standard. *United States v. Perkins,* 926 F.2d 1271, 1275 (1st Cir.1991). Two eyewitnesses, Detgen and Relish, testified at trial to the weather conditions. Although Nagle states in her affidavit that she could corroborate Relish's testimony concerning the weather conditions at the site of impact, that would not help Relish because he admitted on cross-examination

that the weather conditions were accurately described by Detgen during the State's case.

In regard to Nagle's affidavit and her proposed testimony, the following statement is applicable:

> [T]he prosecution has no mandatory obligation to produce *all* witnesses conjecturally available to provide relevant testimony. The prosecution has no defined duty to try the case for the defendant, and consequently it is not an assumed responsibility to provide the defendant's evidence. The *Brady* obligation stops with hiding and non-disclosure of evidence and does not extend to affirmative compilation and production. [citations omitted and emphasis in original]

*Miller v. State*, 830 P.2d 419, 426 (Wyo. 1992). Nagle's proposed testimony is clearly relevant, but it is far from being sufficiently material to warrant a conclusion that, with it, a reasonable probability exists that the jury would have reached a different verdict.

We, therefore, reject Relish's claim that the district court abused its discretion in denying his motion for a new trial. We do so because it was reasonable for the district court to conclude that Daily was disclosed to the defense and that Nagle would not have undermined the jury's verdict.

## II. Jury Instruction

In his second argument, Relish asserts that the district court committed reversible error when it refused to give an instruction, requested by Relish, which stated that the county coroner's death certificate on Neal was prima facie evidence that Neal's death was an accident and not a homicide. The offered instruction is as follows:

> The State has introduced the Death Certificate of Thomas Neal. You are instructed that the Death Certificate is prima facie evidence of the truth of all facts contained in it.

Relish derives his argument from the case of *Alcala v. State*, 487 P.2d 448 (Wyo. 1971). In his appellate brief, Relish describes *Alcala* as:

> [the] case wherein the prosecution, being unable to prove the cause of death in a homicide because of the decomposition of the body, utilized the death certificate to prove the cause of death. The fact that the coroner had written homicide on the death certificate, was used as absolute proof that the decedent had, in fact, been the victim of a homicide.

Therefore, Relish argues, since Neal's death certificate states that he died from an accident, not homicide, and since Relish's theory of defense is that the collision was an accident, then the proposed instruction was one on his theory of defense and to which he was entitled.

There was no error by the district court when it denied Relish's proposed instruction based on *Alcala* because instructions containing incorrect or erroneous statements of the law are properly refused. *Griffin v. State*, 749 P.2d 246, 256 (Wyo. 1988); *Nimmo v. State*, 607 P.2d 344, 350 (Wyo.1980); *Benson v. State*, 571 P.2d 595, 597 (Wyo.1977). Relish's instruction was an incorrect statement of the law in *Alcala*.

In *Alcala* the prosecution was permitted to introduce the decedent's death certificate as evidence that the decedent likely died from asphyxia. *Alcala*, 487 P.2d at 452. The death certificate did not state that the death was the result of murder, negligence or accident and was not offered for such a conclusion. *Id.* Other pieces of circumstantial evidence, such as the fact the body was concealed under water with cement blocks, provided proof of the *corpus delicti*. Therefore, *Alcala* does not support the proposition that a coroner's report is prima facie proof of a conclusion that the death was the result of criminal activity or accident. The offered instruction was properly refused.

## III. Sufficiency of The Evidence

In his final argument, Relish asserts that there was insufficient evidence to convict him of aggravated homicide by vehicle. Wyoming's aggravated homicide

by vehicle statute can be found at W.S. 6–2–106(b) (Cum.Supp.1993) and it provides, in relevant part:

> (b) A person is guilty of aggravated homicide by vehicle * * * if
>
>    *    *    *    *    *    *
>
> (ii) He operates or drives a vehicle in a reckless manner, and his conduct is the proximate cause of the death of another person.

This court applies an oft-repeated standard when reviewing claims of insufficient evidence. We view the evidence in the light most favorable to the State and determine whether it is sufficient to support a finding of a reasonable inference of guilt beyond a reasonable doubt. *Glazier v. State*, 843 P.2d 1200, 1203 (Wyo.1992).

The essence of Relish's argument is that his actions were not sufficiently egregious to constitute *driving in a reckless manner*. Although *reckless* is not defined in the criminal code, the term *recklessly* is defined as follows:

> A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

W.S. 6–1–104(a)(ix) (1988). This definition is a fair statement, long accepted in law, and a reasonable definition of what the legislature intended as behavior that would constitute *driving in a reckless manner.*

At trial the State was able to demonstrate that: (1) Relish was travelling I–80, a road he had driven often, during a snow storm at a minimum speed of 45 miles per hour and perhaps as high as 60 miles per hour; (2) the safe speed in those conditions was 20–25 miles per hour; (3) Relish was in a hurry to deliver a load of perishable vegetables to Wisconsin and unconcerned about being involved in a collision; (4) Relish drove his truck completely off the paved portion of the interstate onto the shoulder where he slammed into a parked vehicle with its hazard lights on, crushing the car and Tom Neal with it; and (5) Relish continued down the interstate approximately one mile until his semi would go no further. Relish, as an experienced interstate truck driver, was well aware of the dangerousness of winter weather conditions on this section of I–80, yet he pushed his 80,000 pound semi at unsafe speeds. These facts are sufficient to support a reasonable inference of proof beyond a reasonable doubt that Relish was operating his semi in a reckless manner.

### CONCLUSION

Because we find that the prosecutor did not commit a *Brady* violation regarding witnesses Daily and Nagle, the district court acted properly in denying Relish's request for an instruction based on *Alcala*, and there was sufficient evidence to support a finding of driving in a reckless manner, Relish's conviction is affirmed.